McLAUGHLIN, Respondent, v. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY and another, Appellants.*

*May 11—June 10, 1966.*

---

[2] See Faris, Accounting for Lawyers (rev. ed.), pp. 73, 286.
* Motion for rehearing denied, with costs, on August 19, 1966.

382

For the appellant Chicago, Milwaukee, St. Paul & Pacific Railroad Company there were briefs by *Bender, Trump, Davidson & Godfrey,* attorneys, and *Rodger S. Trump* of counsel, all of Milwaukee, and oral argument by *Rodger S. Trump.*

For the appellant United States Fire Insurance Company there was a brief by *Cornelisen, Denissen, Kranzush & Kuehn,* and oral argument by *David J. Condon,* all of Green Bay.

For the respondent there was a brief by *Everson, Whitney, O'Melia, Everson & Brehm* of Green Bay, and oral argument by *E. L. Everson.*

FAIRCHILD, J. 1. *Scope of review.* No party has raised any question concerning our jurisdiction to review the various portions of the order which have been challenged. Sec. 274.33 (3), Stats., permits an appeal from an order granting a new trial, and the order appealed from grants a new trial as to one element of damages. We have held that in the converse situation where a trial court sets aside an excessive verdict, orders a new trial on the issue of damages, but awards plaintiff the option of taking judgment for a reduced amount, fixed by the court, plaintiff may appeal from this order.[1] On such appeals, we have reviewed the question whether the amount fixed by the court as reasonable, and for which the plaintiff was permitted to take judgment, was too

[1] *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 578, 117 N. W. (2d) 660.

low.[2] Applying the same principle to this case, defendants could properly appeal from the order and could challenge the court's figure as too high.

Except for the portion of the order directing a new trial on one element of damages, the other portions denied certain motions and granted others, and constituted, in effect, an order for judgment. An order for judgment is not an appealable order.[3] In the instant case, one defendant appealed from the entire order, one defendant appealed from two portions, and plaintiff asks us to review one portion. Each party is asking us to review some portion of the order which would not be appealable if that portion stood alone. No party has objected to our consideration of any challenge.

This court has held that where an order grants a new trial, but also makes other determinations, an appeal cannot properly be taken from the latter portions alone, but those decisions imply that if there had been a proper appeal from the entire order, all portions thereof could be reviewed.[4] There are instances where the question of jurisdiction was not raised, and this court did, on appeal from an order granting a new trial review portions of the order other than the portion granting a new trial.[5] It seems reasonable and desirable in a case like the present one to be able to review on this appeal the various parts of the order other than the portion granting a partial new trial, rather than to decline consideration on this appeal, and require the parties to await entry of judgment and appeal therefrom if they desire review

---

[2] *Boodry v. Byrne* (1964), 22 Wis. (2d) 585, 595, 126 N. W. (2d) 503.

[3] *Mitler v. Associated Contractors* (1958), 3 Wis. (2d) 331, 332, 88 N. W. (2d) 672.

[4] *Raether v. Filer & Stowell Mfg. Co.* (1913), 155 Wis. 130, 134, 143 N. W. 1035; *Asen v. Jos. Schlitz Brewing Co.* (1960), 11 Wis. (2d) 594, 106 N. W. (2d) 269.

[5] See *Gustafson v. Bertschinger* (1961), 12 Wis. (2d) 630, 108 N. W. (2d) 273; *Weihbrecht v. Linzmeyer* (1964), 22 Wis. (2d) 372, 126 N. W. (2d) 44.

of these propositions. Accordingly we hold that where an order grants a new trial and makes other rulings on issues which will ultimately be reflected in the judgment, and a proper appeal is taken from such order as an order granting a new trial, the appeal, and right of the respondent to have review of portions appealed from, may extend to such other rulings as well.

2. *Negligence of the railroad.* Defendant railroad contends that as a matter of law it was free from negligence, and further, that if there was any factual basis for a finding of negligence, it presented a jury question, so that it would be error for the court to find it negligent as a matter of law.

The crossing where the collision occurred is near Crivitz. Highway 141, a principal highway in that area, runs north and south and the track intersects it at right angles. The Beemster automobile struck one of a string of freight cars which were standing still obstructing the crossing. It was dark; there were occasional snow flurries; the automobile approached from the south at about 45 miles per hour. The car obstructing the highway was a flatcar, with a crane mounted on it. Plaintiff saw it first, when it was a little more than one hundred feet ahead. There was no automatic signal, flagman or fusee at the crossing.

The standing cars were part of a freight train which had consisted of about 35 cars, hauled by three Diesel units. It had come from Marinette, heading west as it approached the crossing. Just west of the crossing, the track branched into a Y, one track curving south toward Green Bay, the ultimate destination of the train, and one track curving north into Crivitz, where nine cars were to be set out. After the engines first crossed the highway, there were several maneuvers during which the train moved back and forth, obstructing the crossing. Ultimately the engines and nine cars moved along the Y to the north, and the nine cars were set out on a sidetrack.

The crew then left the engines and walked to a restaurant for supper. Upon reaching the restaurant they were told that an accident had occurred; they boarded the engines and returned to the crossing.

It is sufficiently clear that the collision occurred after the engines and nine cars proceeded toward the north, leaving the crossing obstructed by one of the approximately 26 rear cars. The trial took place nine years after the collision, and only one member of the train crew testified. One part of his testimony would indicate that when the engines and the nine cars to be set out at Crivitz moved away from the rear 26 cars, such rear cars were left entirely east of the crossing, and if such testimony were accepted, it would follow that the collision must have taken place during an earlier maneuver. This testimony, however, is incredible. It would not only mean that the collision occurred before the engine and nine cars left the scene, while the five-man train crew was in the vicinity of the crossing, though unaware of the collision, but, more importantly, such testimony flies in the face of the uncontroverted fact that the cars were obstructing the crossing after the accident when the county traffic officer and other people arrived.

The learned circuit judge deemed that it was negligence for the crew to leave the crossing blocked, without warning signals, in order to go and have their supper. Under the evidence the collision may have happened before the crew actually left the engines to walk to the restaurant. But regardless of when, during this interval, it happened, the critical question is whether the leaving of the cars on the crossing, at night, under existing conditions of visibility, without a warning signal, involved an unreasonable risk of harm to people traveling on the highway.

Defendant railroad argues that it has to run trains across grade crossings in order to operate; therefore it had a right to obstruct the crossing; therefore it was not negligent by reason of the presence of the cars; the

cars were a sufficient warning of their own presence; therefore it had no duty to give additional warning.

Defendant railroad cites decisions generally supporting the principles for which it contends, and, indeed, placing a high value upon the utility of railroad operation in comparing it to the risks caused to motorists, but we do not find these decisions applicable to the circumstances of this case.

In 1929, this court held in *Hendley v. Chicago & N. W. R. Co.*[6] that a complaint stated no cause of action against a railroad where it alleged that a freight train had stood on a crossing for fifteen minutes on a dark night, without any warning signal being given, and an automobile collided with it. The complaint apparently alleged no facts tending to show that no need of railroad operation was reasonably served by leaving the train in that position, and the theory of the plaintiff was that the blocking of the crossing for more than ten minutes violated a statute. This court held that there was no causal connection between the alleged violation and the injury. "The lapse of time therefore went no further than to create the condition in which the accident occurred as distinguished from the cause thereof." In the instant case, however, the evidence shows the circumstances under which the cars were left on the crossing, and we think liability can be predicated upon the proposition that it was a negligent act to leave them there.

In *Schmidt v. Chicago & N. W. R. Co.*,[7] a 1926 case, an automobile collided at night with a train which was in motion across a highway. Although there were electric signals (voluntarily installed by the railroad) they were not working. This court held the signals were designed to warn of the approach of the train, and that the railroad company need not anticipate that without signals an automobile driver would collide with a train actually passing

[6] (1929), 198 Wis. 569, 571, 225 N. W. 205.
[7] (1926), 191 Wis. 184, 210 N. W. 370.

over the crossing. The case does support the proposition that there is no common-law duty to warn highway travelers, at least in the absence of special circumstances, of the presence of a train actually moving across the highway.

Defendant railroad also cites the more recent case of *Devine v. McGowan* [8] but a totally different situation was presented. A motorist collided with a lighted engine which moved across the highway after stopping. The train crew was found negligent as to lookout and the motorist as to management and control. At best for defendant, the decision indicates that in the absence of statute, ordinance, or public service commission order, the railroad had no duty to provide a flagman or other warning.

That unlighted freight cars standing across a well-traveled highway at night present a risk of some magnitude to motorists is self-evident. In determining whether employees of the railroad were negligent in leaving them there, the utility of such act in the operation of the railroad must be balanced against such risk. Where ordinary and reasonably necessary operations of the railroad are involved we have traditionally made the policy judgment that the motorist must take care of himself, but if the creation of the danger serves no useful purpose, the motorist must surely be entitled to consideration.

"Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done." [9]

Decisions of this court recognizing a distinction between needless or unreasonable obstruction of a highway by a railroad, and obstruction incidental to railroad oper-

[8] (1962), 15 Wis. (2d) 534, 113 N. W. (2d) 162.
[9] Restatement, 2 Torts, p. 785, sec. 291.

ational requirements are *Fay v. Minneapolis, St. P. & S. S. M. R. Co.*[10] and *Depow v. Chicago & N. W. R. Co.*[11]

There is no suggestion that any interest of the railroad was reasonably served by leaving the freight cars on the crossing. The crew left them for a period which was to extend not only while they completed setting out the nine cars on the sidetrack, but also while the crew went off for supper. We conclude that under these circumstances the trial court correctly determined that the railroad was negligent as a matter of law.

3. *Alleged failure to prove amended complaint.* It seems that the original complaint alleged the railroad was negligent in that it stopped the train across the highway; that the stopping was not necessitated by any accident; that the stopping was in violation of sec. 192.292, Stats. (standing upon a crossing longer than ten minutes); and was negligent in that it failed to warn motorists. A demurrer by the railroad was sustained on the ground the complaint did not state facts sufficient to constitute a cause of action. The amended complaint added allegations with respect to weather conditions, the importance of the highway, and unusually heavy traffic. The proof as to weather conditions went no farther than the snow flurries previously mentioned, and there was no proof that the traffic was unusually heavy. The highway is an important one.

The railroad contends apparently that it is the law of the case that there was no cause of action without proof of the additional allegations, and they were not proved.

The trial, however, produced evidence of the circumstances under which the blocking occurred, and established the significant fact that the blocking was needless and unreasonable, a fact which was not specifically alleged.

[10] (1907), 131 Wis. 639, 641, 111 N. W. 683.
[11] (1912), 151 Wis. 109, 112, 138 N. W. 42.

These facts are so necessarily interrelated that it seems reasonable to have the circumstances of the blocking considered by the court, and included as a basis for liability.

4. *Award of damages for personal injuries and disability.* The jury awarded $4,000. The judge determined this amount was grossly inadequate and fixed a reasonable sum at $15,000. A new trial was ordered on this issue unless each defendant consent to the entry of a judgment reflecting $15,000 for this item.

Defendant railroad company and defendant insurance company both contend that the $4,000 award made by the jury was adequate (within the range of reasonably debatable amounts) and that it was error to set it aside.

We paraphrase as follows, *mutatis mutandis,* our statements in *Boodry v. Byrne* [12] with respect to our review of a trial court finding that a damage verdict is excessive:

> Where a trial court has reviewed the evidence and has found a jury verdict awarding damages to be inadequate and has fixed an increased amount therefor, and has determined that there should be a new trial on damages unless the defendant exercises an option to permit entry of judgment on the increased amount, this court will reverse only if we find an abuse of discretion on the part of the trial court.

> In reviewing the evidence to determine whether the damages are inadequate both the trial court and this court must view the evidence in the light most favorable to defendant.—On appeal from a determination by the trial court that the found damages were inadequate, this court will not find an abuse of discretion if there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of defendant.

---

[12] (1964), 22 Wis. (2d) 585, 588, 126 N. W. (2d) 503.

We have pointed out that the trial judge, in reviewing damages claimed to be excessive (and the rule must be the same for damages claimed to be inadequate), has the advantage of the same opportunity to observe the injured person as does the jury.[13]

Plaintiff suffered a head injury which cleared up after a short time. He suffered injuries to both knees, the injury to the right knee being more severe. After nine years, it was the opinion of the doctors that the right knee might be improved, or prevented from greater deterioration, by surgery, but the injury was otherwise permanent. He suffered an injury to his left foot which required repeated surgery and a special shoe and which still causes pain after nine years and is permanent.

He had a severe concussion, bleeding from one ear, from which his doctor concluded he had a basilar skull fracture, although this could not be verified by an X ray. Plaintiff had double or triple vision and upset stomach for a week or two. He does not remember the impact with the train, and was unconscious intermittently after the collision and on the way to the hospital.

There were blows to his knees. Injury to the medial cartilage or meniscus of the knee resulted. He has what is commonly called a "trick knee," particularly the right one.

His left foot was treated by an orthopedic specialist from January, 1956, until 1959, and he was examined shortly before trial. In January, 1956, Dr. Nellen found that the joints between the toes and the foot were completely rigid and the toes were bent upward. Attempted treatments were unsuccessful and in February, 1956, Dr. Nellen attempted to loosen up the joints by manipulation while plaintiff was under anaesthesia. This was unsuccessful. In April, 1956, Dr. Nellen removed the ends of the metatarsal bones so that the three middle toes

[13] *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 103 N. W. (2d) 907.

could be brought down. In early 1957 it was necessary to remove a calcium deposit where the ends of the bones had been removed.

On examination before trial, Dr. Nellen found pain over the bottom of the foot as well as the little toe and callous formation of both of these areas. Dr. Nellen said:

". . . After all, we have by the surgery have taken most of the weight bearing off the middle three toes so that whereas in your foot and mine where we walk on five toes, the patient in this instance was walking actually on the two outside toes, so with that much weight distribution he gets callouses and pain.

"The fifth or little toe is quite rigid because that toe wasn't operated and can't be operated, being an outside toe. The middle three toes, while they are not bent up as before treatment, they are shortened as would be expected. After all, we have taken off part of the toe. These three middle toes are shortened and kind of squeezed together, and well, in summary, you can say he has got painful callous and a painful foot."

Plaintiff described pain at the time of the second and third operations so severe that he could not allow even a bed sheet to touch his foot. He now has supports in his his shoe which permit walking, but without the shoe he could not take more than a step or two, and has fallen when he did not have his shoe on. If he walks more than a block or two, it becomes painful even with the shoe. When he has a busy day and is on his feet quite a bit, the foot swells and is painful, and he sleeps with his foot elevated. He testified there had been no improvement of his foot in the last five or six years.

Plaintiff was hospitalized five times, nineteen days after the accident, four days in February, 1956, twenty days in April, thirty days in December-January, 1957, and two days in June, 1957.

Plaintiff was forty-six years of age at the time of trial, with a life expectancy of twenty-four years or more.

We conclude that there was no abuse of discretion in setting aside the $4,000 award as inadequate.

With respect to the $15,000 figure determined by the court to be reasonable, the test is "whether, if the trial court had been sitting as sole trier of the facts and had fixed damages in such amount, we would disturb such finding." [14] We conclude that a finding of $15,000 is within the range of reasonably debatable amounts, and is not against the great weight and clear preponderance of the evidence.

If the defendants desire to submit the question to another jury, they are, of course, at liberty to do so.

5. *Award of damages for impairment of capacity to perform his professional duties.* The jury awarded $12,500.

Plaintiff is an ordained priest, and a member of the Norbertine Order (Premonstratensian Fathers). Upon becoming a member of the Order he took a solemn vow of poverty. Under it he may not have property of his own and anything he might earn he may not keep for himself. He teaches at St. Norbert College, but receives no salary. He taught about two thirds of a full schedule before the collision, since he apparently had other duties, but the injury to his foot has compelled him to reduce his classroom teaching, to about one third of a full schedule.

Testimony was introduced to show the compensation paid to lay teachers of similar qualifications, background and experience during the years between 1955 and the trial. Defendants do not appear to challenge the degree of disability, nor the fairness of the amount awarded if it can be awarded at all and if it can be based on the compensation paid to lay teachers. There was no proof of any offsetting value of maintenance furnished to plaintiff which lay teachers would have to provide for themselves, but defendants make no point of that.

Rather their contention appears to be that no damages can be awarded for impairment of plaintiff's capacity to teach because his religious vows prevent him from receiving, or at least from keeping for himself, any pecuni-

---

[14] *Boodry v. Byrne, supra,* footnote 12, at page 596.

ary gain from his labors, thus making it impossible for him, assuming that he fulfils his vow, to suffer pecuniary loss.

This is the problem: The man had a demonstrated capacity to perform valuable services. He was actually engaged in rendering them as a regular occupation and probably would have continued but for his injury. The reasonable value of such services has been objectively established. This valuable capacity to serve has been substantially impaired by the negligence of the railroad and the insured driver. There is nothing speculative about these propositions. He has chosen, and still chooses, for religious or spiritual reasons, to contribute these services to the Order. Is he to be awarded or denied compensation in damages for the loss of satisfaction to himself in being able to make the contribution? Is his religious vow to be enforced, in a sense, by the courts, with resulting benefit to the defendants and resulting loss to him and to the charity which he chooses to serve?

The learned circuit judge phrased the question to the jury in terms of impairment of capacity to perform professional duties, avoiding reference to earning capacity, but he instructed the jury to consider the testimony as to compensation of lay teachers. He told the jury: "The fundamental reason in the law for asking you to assess his damages, even though he may not be able to retain such money because of his vow of poverty, is that a wrongdoer cannot be heard to complain of the financial circumstances of the one who has sued him and whom he has injured."

Whether the analysis be that plaintiff is to be compensated for the impairment of his ability to contribute his services, the compensation to be measured by the reasonable value of such services, or that the court should disregard his religious vow and award damages for the demonstrated impairment of earning capacity, we arrive at the same result as did the circuit court. It seems to us a fair one.

Defendants acknowledge that they have been unable to find authority precisely in point. They cite two cases where this court held that impairment of earning capacity had not been sufficiently proved, in one case where a plaintiff had worked for a period of years after her injury without any demonstrated loss of earnings,[15] and in another where a plaintiff was not employed and we considered that the evidence as to loss of earning capacity was speculative.[16] Both are readily distinguishable. Once it has been determined that plaintiff is entitled to damages for impairment of earning capacity, the use of the compensation paid to others for like work at the same college provides the most feasible basis for the determination under the circumstances present here.

6. *Award of hospital and medical expenses.* Plaintiff and defendants stipulated that the reasonable fair value of the medical and hospital services was $1,931.39, but that the question of recoverability of these elements of damage was to be determined by the court on evidence to be presented after trial.

After trial, it was shown that the medical and hospital expenses had been paid by the Order, and the court ruled that such amount was therefore not recoverable by plaintiff.

We reach the opposite conclusion.

"The general rule is that a plaintiff who has been injured by the tortious conduct of the defendant is entitled to recover the reasonable value of medical and nursing services reasonably required by the injury. This is a recovery for their value and not for the expenditures actually made or obligations incurred. Thus, under this general rule, the fact that the medical and nursing services were rendered gratuitously to the one who was injured will not preclude the injured party from recovering the value of those services as a part of his compensatory

---

[15] *Behringer v. State Farm Mut. Automobile Ins. Co.* (1959), 6 Wis. (2d) 595, 602, 95 N. W. (2d) 249.

[16] *Puhl v. Milwaukee Automobile Ins. Co.* (1959), 8 Wis. (2d) 343, 350, 99 N. W. (2d) 163.

damages. Accordingly, the plaintiff's recovery will not be reduced by the fact that the medical expenses were paid by some source collateral to the defendant, such as by a beneficial society, by members of the plaintiff's family, by the plaintiff's employer, or by an insurance company. . . ." [17]

Defendants acknowledge that the collateral-source rule is followed in Wisconsin, and we deem the fact that the Order paid for the service and care is immaterial. Such voluntary payment would give the Order no right of recovery against defendants. The situation is not like the case of the husband or parent who, rather than the injured wife or minor child, is permitted to recover such items from the tort-feasor because he became obligated to provide the care made necessary by the wrongful act.

Defendants claim that the services in this case were gratuitously rendered and cite *Seifert v. Milwaukee & Suburban Transport Corp.* [18] for the proposition that the injured person cannot recover medical expenses unless he was obligated to pay them. That case, however, and *Jewell v. Schmidt* [19] involved an injured wife, and held that the recovery for medical services belongs to the husband and not the wife unless the wife had obligated herself by contract to pay for them.

Accordingly the order appealed from must be modified by reinstating the figure of $1,931.39 as the answer to subdivision (c) of the eighth question of the special verdict. The time within which defendants may consent to the entry of judgment in lieu of a new trial on the issue of damages for personal injuries and disability is extended to twenty days after the filing of this record in the office of the clerk of circuit court upon remittitur,

---

[17] 22 Am. Jur. (2d), Damages, p. 288, sec. 207. See also Restatement, 4 Torts, p. 636, sec. 924.

[18] (1958), 4 Wis. (2d) 623, 626, 91 N. W. (2d) 236.

[19] (1957), 1 Wis. (2d) 241, 250, 83 N. W. (2d) 487.

and the amount of such judgment, if so consented to, shall be $29,431.39, plus costs and disbursements.

*By the Court.*—Order modified as set forth in the closing paragraph of the opinion on file herein, and, as so modified, affirmed.