**TOWN OF EAST TROY, a municipal Corporation, Plaintiff–Appellee,**

**v.**

**SOO LINE RAILROAD COMPANY, Defendant–Appellant.**

**No. 79–2120.**

United States Court of Appeals, Seventh Circuit.

Argued April 30, 1980.

Decided Oct. 8, 1980.

Rehearing and Rehearing En Banc Denied Dec. 3, 1980.

Hugh C. Griffin, Chicago, Ill., for defendant–appellant.

John L. Maier, Jr., Rockford, Ill., for plaintiff–appellee.

Before CUMMINGS and BAUER, Circuit Judges, and EAST,* District Judge.

EAST, Senior District Judge.

The Soo Line Railroad Company (Soo Line) appeals the judgment of the District Court, 476 F.Supp. 252, entered on June 14, 1979 pursuant to a jury verdict of $500,000 in favor of the Town of East Troy, Walworth County, Wisconsin (the Town). The verdict was based on the Town's costs to remedy a ground water pollution problem caused by Soo Line's negligence.

We note jurisdiction under 28 U.S.C. § 1291 and affirm.

*BACKGROUND*

On July 16, 1974 at about 3:15 P.M., a tank car and 18 other cars being transported by Soo Line through an unincorporated area known as Lake Beulah or Beulah Station within the limits of the Town derailed. The tank car, carrying 20,000 gallons of phenol, or carbolic acid, ruptured and spilled approximately half its contents onto the ground. The phenol, manufactured by the Georgia–Pacific Corporation (Georgia–Pacific) was en route from Georgia–Pacific's plant in Louisiana to Borden Chemical Ltd. in British Columbia. The parties' stipulation of facts presented to the jury described phenol:

> "Phenol is a by–product of quemene which is derived from benzene which in turn comes from oil. It is a colorless to light pink crystalline material which melts at 106° Fahrenheit. The Interstate Commerce Commission lists phenol as a Class B Poison. It is widely used in commerce and industry in the manufacture of hospital disinfectants and other drugs

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

and pharmaceuticals. It is also used in the manufacture of certain glues and resins and in some plastics."

The Lake Beulah area contains scattered homesites, a tavern, and a small manufacturing plant. At the time of the spill, there was no public water supply system. Residents relied on shallow private wells for domestic water use. Despite clean–up efforts, including the removal by Soo Line at the advice of the State Department of Natural Resources of over one million pounds of contaminated dirt, residents of the area complained of a bad taste and unusual smell in their water and experienced headaches, nausea, mouth sores, diarrhea, and dark urine. A toxicologist with the Environmental Protection Agency advised that no individual should be exposed for more than five days to concentrations greater than .001 milligrams of phenol per liter of water. A number of wells close to the spill site had phenol concentrations in excess of this standard. The distance the phenol spread and the extent of future hazards are disputed.

The Town is a rural area of 36 square miles and has approximately 3,000 residents. At the time of the accident, there was no Town Sanitary District and no centralized water supply for any part of the Town. The only properties owned by the Town in 1974 were the Town Hall and some lake landings and roads, none of which were damaged by the spill.

In early 1975, the Town retained private engineering firms to study the feasibility of constructing a public water supply system to serve Lake Beulah. The Town then formed a Sanitary District, purchased land, and engaged various engineers and contractors to build a centralized deep well public water system. The Town well was drilled to a deep aquifer separated by an impermeable layer of shale from the contaminated aquifer from which the individual property owners obtained their water. Those residents who elected to use the Town's system paid a tap–on fee and a monthly bill for water used. The system has the capacity for serving all lots in the Lake Beulah area.

The cost of constructing the well and the related mains, pumps, and pump house was $125,000. The Town paid for the well and for the services of its engineers, planners, excavators, chemists, attorneys, geologists, plumbers, hydrogeologists, etc. with a $500,-000 Community Development Grant from the U. S. Department of Housing and Urban Development (HUD).

*PROCEEDINGS IN THE DISTRICT COURT*

The Town, together with the individuals who claimed damage from the spill, filed suit against Soo Line and Georgia–Pacific on February 24, 1975. All individual plaintiffs settled, and the claim against Georgia–Pacific was dismissed. The case proceeded to trial as a public nuisance action in which the Town sought to recover $543,000 for its expenses incurred as a result of the spill. Soo Line's motion for summary judgment on the ground that Wisconsin law does not permit the Town to maintain such an action or to obtain such a windfall recovery was denied, and Soo Line was precluded from introducing any evidence of the HUD grant at trial. In a special verdict, the jury found Soo Line guilty of negligently creating a public nuisance and awarded the Town $500,000. The jury rejected the claim that Soo Line was guilty of wilful and wanton conduct. Soo Line's post–trial motions for judgment notwithstanding the verdict, for an alteration in the judgment, and for a new trial were denied. This appeal followed.

*ISSUES ON APPEAL*

1. Was the Town's public nuisance action barred by the "injury peculiar to the complainant" requirement of § 823.01 of the Wisconsin Nuisance Statute?

2. Did the Town's receipt of the HUD grant prevent recovery of damages against Soo Line?

3. Did various errors in jury instructions and evidentiary rulings entitle Soo Line to a new trial?

*DISCUSSION*

*Issue 1: Town's Standing to Bring Public Nuisance Action.*

This case was tried on a public nuisance theory under the Wisconsin Nuisance Statute. Wis.Stats. § 823.01 reads as follows:

"823.01 Jurisdiction Over Nuisances

"Any person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance from which injuries peculiar to the complainant are suffered, so far as necessary to protect the complainant's rights and to obtain an injunction to prevent the same."

Thus, in order to recover its damages, the Town had to show that it suffered injuries peculiar to itself.

Soo Line does not appeal the finding that the phenol spill created a public nuisance. It contends, however, that the Town can claim damages only if land it owned was injured by the spill or if some Town function was impaired. It relies on cases decided under predecessor statutes to § 823.01. *See Algoma v. Peterson,* 233 Wis. 82, 288 N.W. 809 (1939); *Juneau v. Badger Cooperative Oil Co.,* 227 Wis. 620, 279 N.W. 666 (1938); *City of Madison v. Wisowaty,* 211 Wis. 23, 247 N.W. 527 (1933); *City of Milwaukee v. Milwaukee and Beloit Railroad Co.,* 7 Wis. 85 (1858). Soo Line contends that the statute does not permit recovery for expenses incurred by the Town in its "voluntary" efforts to alleviate the public nuisance. *See Carey v. Brooks,* 1 Hill 365 (S.C.1833). Soo Line argues that only the individual property owners had the right to bring actions under the nuisance statute.

The District Court agreed with Soo Line's statement of the question but arrived at a different answer in denying Soo Line's motion for summary judgment:

"Since the sole relief sought by the town is damages, the question is whether the town alleges any injuries peculiar to itself. In my judgment, the town has done so. The expenses incurred by the town in assisting the residents affected by the phenol spill are an injury peculiar to the town; none of the other plaintiffs or town residents may properly claim those items of injury as their own.

"In addition, the water system which the town constructed is the result of an injury peculiar to the town, to the extent such system was necessary to overcome the damage caused by the phenol spill."

There is no question that the Town has the power to expend money for the public health and welfare. Wis.Stats. § 60.18 (Supp. 1979–80) states:

"The qualified electors of each town shall have power at any annual town meeting by vote:

\* \* \* \* \* \*

"(12) . . . To direct, by resolution, the town board to exercise all powers relating to villages and conferred on village boards by ch. 61, except such power, the exercise of which would conflict with the statutes relating to towns and town boards. Any such resolution heretofore adopted pursuant to existing law or hereafter adopted pursuant to this law shall remain in force until rescinded."

The Town passed such a resolution on April 14, 1973 and has never rescinded it. Wis. Stats. § 60.29(13) vests the Town board with authority "[t]o exercise powers relating to villages and conferred on village boards when lawfully authorized so to do by resolution of the town meeting adopted pursuant to subsection (12) of section 60.18."

Section 61.34 enumerates powers of a village board which the Town became authorized to exercise upon passage of its resolution. Section 61.34(1) provides:

"61.34 Powers of village board

"(1) General grant. Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, navigable water, and the public service, *and shall have power to act* for the government and good order of the village, for its commercial benefit and *for the health, safety, welfare and convenience of the public,* and may carry its powers into effect by license, regulation, suppression, borrowing, taxation, special assessment, appropriation, fine, imprisonment, and *other necessary or convenient means.* The powers hereby conferred shall be in addition to all other grants and shall be limited only by express language." (Emphasis supplied).

Thus, by adopting its resolution, the Town electors authorized their board to act "for the health, safety, welfare and convenience of the public." The District Court based its decision on the Town's power under §§ 60.-18(12) and 61.34(1) to protect its residents' health, safety, and welfare.

Although Soo Line does not dispute the Town board's authority to act, it claims that the board's gratuitous expenditures cannot bootstrap it into the position of an injured party. The Town argues, however, that it was obligated to exercise its full power to protect the health of its residents.

When questioned about this obligation at oral argument, counsel for the Town referred the Court to the petition process in Chapter 60 of Wisconsin Statutes. Counsel stated that this was the method used to create the sanitary district here. Sections 60.301–60.303 do empower the Town board to establish a sanitary district when specified petition and hearing requirements are met; and § 60.306(2) (Supp. 1979–80) provides that the sanitary district commission "*shall* project, plan, construct and maintain a system or systems of waterworks ... necessary for the promotion of the public health, comfort, convenience or public welfare of such district ...." (Emphasis supplied). Although we have no reason to doubt that the petition procedures specified were properly complied with, the record before this Court is silent.[1] We assume that the Town made no record of its compliance with the petition process for creation of a sanitary district because it relied in the District Court on its authority under its § 60.18(12) resolution to exercise the powers of a village board, rather than on its § 60.301 authority.

■ We realize that the Town, as appellee, may urge this Court to affirm on grounds it did not press before the District Court. An appellee may

"urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the

reasoning of the lower court or an insistence upon matter overlooked or ignored by it". *United States v. American Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924). *Accord, LeTulle v. Scofield*, 308 U.S. 415, 421, 60 S.Ct. 313, 316, 84 L.Ed. 355 (1940); *Morley Const. Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593 (1937); *Drinan v. A. J. Lindemann & Hoverson Co.*, 238 F.2d 72, 74 (7th Cir. 1956).

In this case, however, the record evidence simply does not establish that the Town was forced by petition of the requisite percentage of landowners to create the sanitary district. Nonetheless, this gap in the record does not restrain us from concluding that the Town was, indeed, obligated to act as it did. Even in the unlikely event that counsel's statement that the Town was compelled to act is ungrounded, it is clear that the Town could have been compelled to act by 51% of the landowners or by the owners of 51% of the land in the proposed district. Section 60.302(1). The record does indicate substantial public pressure on the Town to eliminate the pollution problem caused by the phenol spill.

We do not find it necessary to rely on §§ 60.301–60.306, however, because we believe the authority relied on by the District Court is sufficient in the circumstances presented here to invoke an obligation on the part of the Town board to alleviate a threat to the public health.

This being a diversity case, we follow the rule of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and apply the substantive law of Wisconsin. As this Court stated in *Warner v. Gregory*, 415 F.2d 1345, 1346 (7th Cir. 1969), however:

"*Erie* and its progeny do not require an automatic application of the last highest state court determination. Professor Corbin in describing the task of the federal court in applying state law said:

---

1. The evidentiary record is replete, however, with public protests and demands for useable domestic water.

" 'When the rights of a litigant are dependent on the law of a particular state, the court of the forum must do its best (not its worst) to determine what that law is. It must use its judicial brains, not a pair of scissors and a paste pot. Our judicial process is not mere syllogistic deduction, except at its worst. At its best, it is the wise and experienced use of many sources in combination—statutes, judicial opinions, treatises, prevailing mores, custom, business practices; it is history and economics and sociology, and logic, both inductive and deductive.' Corbin, The Laws of Several States, 50 Yale L.J. 762, 775 (1941).

"Justice Frankfurter struck the same chords in his concurring opinion in *Bernhardt v. Polygraphic Company of America, Inc.*, 350 U.S. 198, 205–212, 76 S.Ct. 273, 277–281, 100 L.Ed. 199 (1956), where he looked behind the Vermont Supreme Court's decisions to determine the present status of Vermont law."

And, of course, we need apply judicial precedents only "to cases which factually require the same legal conclusion, but not to cases involving significantly different facts." *Ohio Casualty Insurance Co. v. Smith*, 297 F.2d 265, 267 (7th Cir. 1962).

In the recent case of *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657 (3d Cir. 1980), the Court was faced with a nine–year old Ohio Supreme Court case, which had never been expressly overruled, holding, for statute of limitations purposes, that a cause of action for medical malpractice arises at the latest when the physician–patient relationship terminates. The Court had considered and rejected the rule recognizing the date when the plaintiff discovers the alleged negligence, stating that adoption of the discovery rule was for the legislature. Nevertheless, the *McKenna* Court, in fulfilling its task of deciding how the Ohio Supreme Court would rule, concluded that the Ohio Court would hold that the applicable statutes of limitations were tolled until the plaintiff discovered the cause of her injuries. The Court stated:

"In the absence of authority directly on point, decisions by [the Ohio Supreme Court] in analogous cases provide useful indications of the court's probable disposition of a particular question of law. It is important to note, however, that our prediction 'cannot be the product of a mere recitation of previously decided cases.' In determining state law, a federal tribunal should be careful to avoid the 'danger' of giving 'a state court decision a more binding effect than would a court of that state under similar circumstances.' Rather, relevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." At 662. (Footnotes omitted).

In addition, the Court quoted *Becker v. Interstate Properties*, 569 F.2d 1203, 1206 (3d Cir. 1977):

"A diversity litigant should not be drawn to the federal forum by the prospect of a more favorable outcome than he could expect in the state courts. But neither should he be penalized for his choice of the federal court by being deprived of the flexibility that a state court could reasonably be expected to show." *Id.* at 663.

Fortified with these teachings, we examine the law of Wisconsin relevant to the issues here, beginning with the decisions of the Wisconsin Supreme Court, "the best authority on its own law." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).

In *City of Juneau v. Badger Cooperative Oil Co.*, 227 Wis. 620, 279 N.W. 666 (1938), the Wisconsin Supreme Court considered an action to enjoin construction of a bulk oil storage plant and filling station. The opinion largely concerned itself with invalidating the city's ordinances which were designed to keep such facilities outside the city limits. In one paragraph, however, the Court considered common law nuisance and the standing of the city under Wis.Stats. § 280.02, the predecessor to § 823.02, which provided in pertinent part that an action to abate a public nuisance must be "prose-

cuted ... by the attorney–general upon his own information, or upon the relation of a private individual having first obtained leave therefor from the court." The Supreme Court in *City of Juneau* held: "As leave of the court was not obtained and as the city is not 'a private individual' anyhow, and no special injury to the city was proved, no case in favor of the city was established, and the complaint must be dismissed." 279 N.W. at 673.

The Court's statement that the city suffered no special injury was gratuitous dictum not necessary to the result; the city clearly could not bring an action under § 280.02 as it was not "a private individual" and it had not obtained leave from the Court. *State v. La Crosse Theaters Co.*, 232 Wis. 153, 286 N.W. 707, 709 (1939), makes it clear that special injury is not a requirement under § 280.02. The *Juneau* Court may have been implying by its "special injury" language that the city would also lack standing under § 280.01, the predecessor to the statute involved in the present case. Section 280.01 read: "Any person may maintain an action to recover damages for and to abate a private nuisance or a public nuisance from which he suffers injury peculiar to himself, so far as necessary to protect his rights and to obtain an injunction to prevent the same." Had the Court expressly considered § 280.01 and had it concluded that the city was a "person," then its statement that "[i]t is not shown that the city has any property affected by the defendant's tanks and no other special injury or interest of the city is shown," 279 N.W. at 673, would carry more precedential weight. In any event, the Court implied that not only a property interest, but any "other special injury or interest" was sufficient to maintain a nuisance action. The Court, of course, gave no indication whether expenditure of funds to clean up a spill or to put out a fire caused by negligence at defendant's plant would constitute a special injury to the city.

*City of Algoma v. Peterson*, 233 Wis. 82, 288 N.W. 809 (1939), was an action to enjoin construction of a gasoline service station. The City of Algoma's ordinance, which was similar to Juneau's, was likewise struck down; and its § 280.02 claim was rejected as follows: "The city is not a private individual, nor did it bring the action in the name of the state,[2] nor did it first procure leave of the court to bring the action. This requires dismissal of the action." 288 N.W. at 810. The Court then went on to state:

> "The plaintiff has no property that can be affected by the erection of the gasoline station, and without that it can not bring an action to restrain either a private or public nuisance under Sec. 280.01, Stats. *See La Crosse Theatres Co.* case, *supra.*" At 810.

*La Crosse Theaters,* however, does not hold that a § 280.01 plaintiff must have property affected by the alleged nuisance. *La Crosse Theaters* was a § 280.02 case, and its only comment on the requirements under § 280.01 was to restate the statute's own broad requirement that the plaintiff suffer some "injury peculiar to himself." 286 N.W. at 709.

The *Algoma* Court then considered the statute relied on by the trial court in allowing the city to proceed. It was a broad statute, similar to § 61.34 relied on by the Town, which granted power to act "for the health, safety, and welfare of the public." The Court assumed that this statute would authorize maintenance of the action but for § 280.02 which precluded it, citing *Madison v. Wisowaty*, 211 Wis. 23, 247 N.W. 527.

In *Madison,* the defendant had erected structures on the bed of Lake Monona, which is owned by the state but situated within the City of Madison. The Wisconsin Supreme Court held that the city's action to abate the nuisance was demurrable for failure to state a cause of action:

> "[T]here is no allegation in the complaint that the city has suffered any private or

---

**2.** The Wisconsin Supreme Court, in *La Crosse Theaters,* 286 N.W. at 709, explained who the named plaintiff must be in § 280.01 and § 280.02 suits: "The former section applies to actions brought by a private person in his own name and right. The latter applies to actions by the state brought on relation of a private person."

special injury peculiar to itself, or that defendants' structures encroach upon or interfere with any property owned by the city or the exercise of any right vested in it." 247 N.W. at 529.

Since the city had failed to allege any injury to itself or any interest in the lake bed, it was not the real party in interest; the state was. Had the city sued in the state's name rather than its own under § 280.02, there would have been no problem. The Court even noted a statute giving the city jurisdiction to bring the action that it believed satisfied the leave of the court requirement. The *Madison* case is largely an instruction on proper pleading; its holding need not detain us in reaching our result. The broad language regarding the type of interest or injury necessary to give the city standing implies that an ownership interest is not necessarily required.

■ None of the above cases cited by Soo Line are so close factually to this case as to require the same legal conclusion that the Town may not maintain its nuisance action. *See Ohio Casualty.* Nor do we feel constrained by the supreme court's brief comments in *City of Milwaukee v. Milwaukee & Beloit Railroad Co.,* 7 Wis. 85, 89–90. These early cases primarily relied on provisions of § 280.02 which barred the actions; those provisions are simply not involved here. We do not quarrel with the obvious requirement of § 823.01 that the Town show some interest on its part or some injury peculiar to itself, but we are not convinced that Wisconsin law requires the Town to establish a property interest interfered with by the public nuisance.

Significantly, none of the cited cases involved an actual present danger to the public health and welfare. The Town was not a disinterested party contemplating some future potentially harmful occurrence. We do not believe that the Wisconsin Supreme Court would have the Town board sit idly by and wait for the state to take action to abate a serious threat to the public health when the Town had the undisputed power to correct the situation and when the people of the Town were severely inconvenienced,

ill, and clamoring for action. Indeed, the Court has acknowledged the grave problem of water pollution and the power of a Town board to control it. *Town of Norway v. State Board of Health,* 32 Wis.2d 362, 145 N.W.2d 790 (1966), involved the town of Norway's standing in judicial review of the State Board of Health's decision to approve a sewage treatment facility. The supreme court stated at 145 N.W.2d at 794:

"It is conceeded [*sic*] Norway has no riparian interest in Wind Lake but by authority of Sec. 60.18(12), Stats., it passed a resolution in 1962 authorizing the town board of Norway to exercise the powers of a village board. These powers include the right to manage and control navigable water and to act for the health, safety, welfare and convenience of the public. Sec. 61.34(1), Stats. The pollution of public waters is a matter of great public concern and inimical to public health. *State ex rel. Martin v. City of Juneau* (1941), 238 Wis. 564, 572, 300 N.W. 187. This concern is not exclusively that of the Board and the Committee. We think this governmental right in the town board of Norway to prevent and control the pollution of waters is sufficient legal interest to constitute Norway an aggrieved person."

Although the circumstances giving rise to *Town of Norway* are certainly different from the circumstances here, the language of that decision evinces deference to and encouragement of attempts by towns to exercise their governmental powers to control water pollution—even absent any proprietary interest.

Moreover, the Wisconsin legislature has expressed its desire for municipalities to exercise broad powers on behalf of the public welfare, and particularly in the area of water pollution. In 1939, the nuisance statutes were amended to authorize cities, villages, and towns to bring nuisance actions. In 1943, they were authorized to bring suit under § 280.02, now § 823.02, in their own names without obtaining leave from the court. In addition to these and to the statutes cited above regarding establishment of

sanitary districts and exercising village board powers, numerous provisions of Wisconsin statutes, not directly applicable here, indicate that wide latitude is given to towns in protecting the waters of the state. *E. g.*, § 66.33 (towns authorized to accept federal grants for water pollution prevention or abatement); § 144.025(1) ("It is the express policy of the state to mobilize governmental effort and resources at all levels, state, federal and local" to protect waters of the state, "ground and surface, public and private"); § 146.14 (local health officials may abate nuisances caused by improper sewerage disposal).

■ We conclude from our analysis of the foregoing that were the Wisconsin Supreme Court to rule on this case, it would find a compelling governmental interest and duty on the part of the Town to do whatever was reasonable at the time to ameliorate the hazardous situation as quickly as possible and to protect the health of the people.[3] All necessary and reasonable expenses that were incurred in the exercise of the Town's lawfully delegated powers are recoverable under § 823.01.[4]

*Issue 2: HUD Grant.*

■ Soo Line claims that the Town has not suffered any injury and, therefore, cannot recover damages. We have rejected, however, its view that recovery under § 823.01 requires injury to the Town's own property. The jury found that Soo Line's negligence was the proximate cause of the Town's loss. The District Court held, and we agree, that this loss is actionable under § 823.01. If the Town has obtained a windfall, such is the routine result of application of the collateral source rule.

In *Rixmann v. Somerset Public Schools*, 83 Wis.2d 571, 266 N.W.2d 326 (1978), reimbursement of medical expenses by plaintiff's insurer did not prevent plaintiff's full

recovery from defendant. *See also Thoreson v. Milwaukee and Suburban Transport Co.*, 56 Wis.2d 231, 201 N.W.2d 745 (1972); *Merz v. Old Republic Insurance Co.*, 53 Wis.2d 47, 191 N.W.2d 876 (1971); and *McLaughlin v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 31 Wis.2d 378, 143 N.W.2d 32 (1966), for the proposition that plaintiff's recovery will not be reduced because of reimbursement by an independent source for damages caused by defendant. There is no question that Wisconsin law prefers double recovery for a plaintiff to allowing a defendant to avoid paying for the consequences of his or her wrongful acts. Similarly, in *Roundhouse v. Owens–Illinois, Inc.*, 604 F.2d 990 (6th Cir. 1979), the Sixth Circuit ruled that receipt of federal funds in partial reimbursement of plaintiff's loss did not bar recovery of the full amount of damages caused by defendant's conduct.

■ It is not our task to analyze the wisdom of the collateral source rule. Having determined that the rule is the law of the state, it is eminently clear that the Town was entitled to recover its full damages and that Soo Line was properly prevented from possibly creating jury bias in its favor by mentioning or producing evidence of the HUD grant to the Town.

*Issue 3: New Trial.*

Soo Line cites several actions by the District Court which it claims entitle it to a new trial if this Court rules against it on Issues 1 and 2. We have already disposed of its allegations that the nuisance instructions were improper and that evidence of the HUD grant should have been admitted. We now conclude that the remainder of Soo Line's allegations of error are likewise without merit.

■ Soo Line's witness Bertel E. Pearson was prohibited from giving opinion testimo-

---

**3.** Because of our conclusions regarding this issue, we reject Soo Line's challenges to the District Court's jury instructions on nuisance.

**4.** Soo Line is mistaken, however, in its belief that the necessity of specific expenses is to be judged with the benefit of hindsight. The

Town cannot be expected, during a public health disaster and with discrepant professional opinions, to foresee precisely which actions will be successful and which will be cumulative or superfluous.

ny because he had not been disclosed as an expert witness in response to the Town's interrogatories until after the Court–imposed discovery deadline had passed, thus depriving the Town of the opportunity to depose Pearson.[5] The Court's deadline was reasonable and was applied to both parties. The exclusion of Pearson's expert testimony was a proper exercise of the Court's discretion.

■ Soo Line alleges that the District Court erred in giving a res ipsa loquitur instruction since the Town had presented evidence of specific negligence. Although Soo Line acknowledges that Wisconsin law does not preclude the res ipsa loquitur instruction in all cases involving specific negligence, it believes this case is sufficiently similar to *Utica Mutual Insurance Co. v. Ripon Cooperative*, 50 Wis.2d 431, 184 N.W.2d 65 (1971), in which giving the res ipsa loquitur instruction was held to be reversible error, to require the same result here. We disagree. In that case, the Court rejected the use of the res ipsa loquitur instruction because the plaintiff had offered expert testimony as to "exactly where, how and why" the accident occurred. 184 N.W.2d at 69. However, the Court generalized that between the poles of pure conjecture and such substantial evidence as to constitute a complete explanation was a middle ground where the giving of the instruction would be proper. *Id.* We agree with the District Court that this case falls squarely in that middle ground. The giving of the instruction here was correct.

■ Soo Line charges further that portions of the deposition of Harry A. Lloyd read at trial constituted inadmissible hearsay. Specifically, Lloyd testified that he overheard a discussion among several railroad employees in which comments were made concerning an excess number of derailments in the area and the improper placement of the empty cars on the train. The statements were admissions by a party opponent under Rule 801 of the Federal Rules of Evidence and were, therefore, not hearsay. The fact that Soo Line then read portions of Lloyd's cross–examination in which Lloyd expressed some doubts as to whether the declarant was definitely a railroad employee does not render the initial statements inadmissible.

■ Exclusion of the Southeast Wisconsin Regional Planning Report indicating that the Town probably would have to install a public well at some time in the future was proper because the report was totally irrelevant to the issue of whether the Town's installation of a water distribution system at this time was the result of defendant's negligence in causing the pollution of the private wells.

■ Soo Line asserts that the Town did not prove the reasonableness of its expenses. It is true that the Town did not produce expert testimony as to the reasonableness of every itemized expense. Nevertheless, it did present, in addition to bills and cancelled checks, sufficient evidence of the nature of the work done by the various professionals, the time involved, and the rate of compensation, thereby enabling the jury to determine the reasonableness of the expenses. The engineer with the highest fees did testify as to the reasonableness of his fees. Soo Line did not challenge the Town's expenses as being unreasonable. Although the expenses clearly must be reasonable, Soo Line has cited no case supporting its view that the plaintiff must present expert testimony on reasonableness of fees even if the record contains substantial evidence on which the jury could determine reasonableness. On the contrary, in the cases relied on by Soo Line, the supreme court actually found there was no evidence in the record from which the fact–finder could determine if the claimed expenses were reasonable. *Nimlos v. Bakke*, 223 Wis. 473, 271 N.W. 33, 34 (1937); *Tullgren v. Karger*, 173 Wis. 288, 181 N.W. 232, 234

---

5. We discount Pearson's deposition of December 1, 1975. Soo Line even conceded that, though it knew the identity of its experts shortly prior to the discovery deadline of December 15, 1978, deposition's would not have been meaningful at that time because its experts had not yet completed their work.

(1921). Furthermore, in *Gerbing v. Mc-Donald*, 201 Wis. 214, 218–19, 229 N.W. 860, 862 (1930), in which the Court allowed recovery of relatively small medical bills without proof of reasonableness, the Court said:

> "The weight of authority seems to be that where the character of the injury and of the treatment and the services of the physician and the amount paid for the service are fully proved, this constitutes evidence from which the jury may allow damages although there is no proof of either necessity or the reasonable value of the services."

As the supreme court said in *Reinke v. Woltjen*, 32 Wis.2d 653, 146 N.W.2d 493, 494 (1966), quoting *Mack Trucks, Inc. v. Sunde*, 19 Wis.2d 129, 135–36, 119 N.W.2d 321, 324 (1963):

> "A verdict approved by a trial court must be sustained if there is credible evidence which under any reasonable view admits of an inference that supports the jury's findings."

Finally, we reject Soo Line's claim that the District Court erroneously admitted evidence concerning the dangers of phenol in its undiluted form and in combination with chlorinated water. This testimony was relevant to the existence and extent of the public health hazard to which the Town was responding.

Soo Line's arguments for a new trial leave us unconvinced. Having failed to agree with any of Soo Line's allegations of error, we affirm the judgment of the District Court.

AFFIRMED.