OPINION OF THE COURT
 

 ADAMS, Circuit Judge.
 

 In this appeal, Ewing, Cole, Erdman & Eubank (Ewing, Cole), an architectural firm, challenges the judgment of the district court that it is liable in tort for damages incurred by its client. Because we determine that the plaintiff failed to carry its burden of proving that Ewing, Cole had not met the standards of a reasonably prudent architect, we reverse.
 

 I.
 

 This dispute arises out of the construction of student dormitory housing for the New Brunswick campus of Rutgers University. The New Jersey Educational Facilities Authority (the Authority) and Ewing, Cole entered into a contract on September 25, 1971 under which Ewing, Cole was to serve as executive architect for the project. The trial court found that under the terms of the contract Ewing, Cole was responsible for providing all necessary architectural and engineering services: specifically, preparation of a feasibility study and bidding documents, and administration of the contract between the Authority and the contractor. App. at a-41. Nothing in the contract required Ewing, Cole to give advice about protecting the Authority from the possibility that the contractor would file for bankruptcy, nor did the Authority ever specifically request such advice.
 

 Stirling Homex Corporation (Stirling Ho-mex), a manufacturer of pre-fabricated housing, was awarded the contract by the Authority. Instead of using conventional on-site construction methods, Stirling Ho-mex proposed to manufacture modules at its plant in Avon, New York and then to ship the completed modules in groups to New Brunswick, where they would be assembled into dormitories.
 

 Between the time the contract was awarded to Stirling Homex and July 12,
 
 *16
 
 1972, when Stirling Homex filed a petition in bankruptcy, Ewing, Cole authorized five progress payments to the contractor for materials purchased and work completed at the Avon plant. Following each request for payment, a representative from Ewing, Cole visited the Stirling Homex plant. He conducted spot checks to ascertain that the materials specified in the requests for payment existed, were segregated and identified as belonging to the Authority, and were insured against theft, fire and vandalism. App. at a-44.
 

 Shortly after Stirling Homex filed its bankruptcy petition, a trustee in bankruptcy was appointed, who claimed title to all of the materials and work-in-progress at Stirling Homex’ Avon plant, including those goods that had been paid for by the Authority. The trial court sitting without a jury calculated the total value of the undelivered materials and modules for which the Authority had paid to be $441,874.
 
 [1]
 

 Stirling Homex had, at the inception of the project, procured a payment and performance bond from Travelers Indemnity Company (Travelers), in favor of the Authority. After Stirling Homex declared bankruptcy, the Authority called upon Travelers to honor its performance bond. Travelers negotiated with the trustee to obtain the materials still at the Stirling Homex plant in Avon for which the Authority had paid. When it was unsuccessful, Travelers arranged for another contractor to complete the project, and made no further efforts to assert claims to the goods and materials.
 

 Following the completion of the project, Travelers brought suit as the subrogee of the Authority against Ewing, Cole contending that the architect had breached its contract with the Authority and had acted negligently by permitting progress payments for off-site work and materials. The district court concluded that there had been no breach of the contract between the Authority and Ewing, Cole, App. at a-45, but that the architect was liable in tort because it had violated its duty to exercise reasonable care. App. at a-47. The determination of liability was based on the conclusion that Ewing, Cole had a duty to inform “the Authority of any method whereby it could exercise control over its property.” App. at a-48. The court noted specifically that the architect might have suggested to the Authority that it could have increased the protection of its interest in the property against the possibility that Stirling Homex would file for bankruptcy by employing such options as field warehouses or bonded warehouses. App. at a-47. The district court did not address the issue of causation between the alleged tort and the damage claimed, nor did it explore the question whether a government agency represented by legal counsel could reasonably have relied on its architect to suggest legal mechanisms for protecting its property interests in materials and work-in-progress remaining in the possession of its contractor.
 

 
 *17
 
 II.
 

 Both parties agree that in this diversity-action New Jersey law controls. They further appear to accept the proposition that in New Jersey an architect may be held liable in tort if he fails to exercise that level of care expected of a reasonably prudent architect and his negligence is the proximate cause of injury to his client.
 
 See
 
 Note,
 
 Liability of Design Professionals
 
 — The
 
 Necessity of Fault,
 
 58 Iowa L.Rev. 1221, 1228 n. 47 (1978) (citing cases). It is also undisputed that Ewing, Cole did not inform the Authority that, by paying for materials and work-in-progress without gaining actual physical possession, the Authority was incurring certain risks if the contractor became bankrupt and that there were legal mechanisms that could reduce those risks, albeit at the cost of some inefficiency in the manufacturing process.
 

 The issue in the case at hand is whether a district court sitting in diversity and applying New Jersey law, may hold a professional architect liable for not communicating such information to his client, when there is no precedent for such a finding in similar or analogous circumstances and nothing in the record to suggest that the facts here are so unusual as to merit special treatment.
 

 Tort law ordinarily does not prescribe the conduct expected of an individual in any detail. “[T]he infinite variety of situations which may arise makes it impossible to fix definite rules in advance for all conceivable human conduct.” W. Prosser, Law of Torts, at 150 (4th ed. 1971). Instead, tort law calls upon the fact finder to determine what a reasonable person in like circumstances would have done and to compare that hypothetical conduct with the actions of the alleged tort feasor. Where the case concerns the level of care required of a professional, the standard usually is determined on the basis of expert testimony. The process for fixing liability in such a situation is advertently flexible in order to allow the law to reflect the changing attitudes and expectations of the community.
 

 A finding of negligence is, as a general rule, considered a finding of fact reviewable by an appellate court under the clearly erroneous standard.
 
 Sun Oil Co. v. Humble Oil & Refining Co.,
 
 431 F.2d 1119 (3d Cir.1970),
 
 cert. denied,
 
 401 U.S. 1003, 91 S.Ct. 1231, 28 L.Ed.2d 539 (1971); C. Wright and A. Miller, Federal Practice and Procedure, § 2590 (1971 & Supp.1983). Where, as here, however, the issue is whether the level of care exercised by the defendant measured up to the standard expected of reasonably prudent architects, there is a mixed question of law and fact, and an appellate court may review the district court’s legal conclusion on a plenary basis. Cf.
 
 United States ex rel. Johnson v. Johnson,
 
 531 F.2d 169, 174 n. 12 (3d Cir.1976).
 

 III.
 

 A federal court sitting in diversity is bound to apply the substantive law of the state in which it sits.
 
 Erie R.R. v. Tompkins,
 
 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As this Court has noted, however, there frequently is no “readily accessible or easily understood body of state law.”
 
 McKenna v. Ortho Pharmaceutical Corp.,
 
 622 F.2d 657, 661 (3d Cir.1980),
 
 cert. denied,
 
 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). That is the case here, and in such a situation, federal courts are called upon to predict how state courts would resolve the relevant issues.
 
 Brown v. Caterpillar Tractor Co.,
 
 696 F.2d 246, 250 (3d Cir.1982);
 
 Barris v. Bob’s Drag Chutes & Safety Equipment,
 
 685 F.2d 94, 98 (3d Cir.1982). ' There are a variety of factors that a federal court should consider in making such predictions including “relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.”
 
 McKenna v. Ortho Pharmaceutical Corp.,
 
 622 F.2d at 663;
 
 Michelin Tires, (Canada) Ltd. v. First Nat. Bank of Boston,
 
 666 F.2d 673, 682 (1st Cir.1981);
 
 Town of East Troy v. Soo Line R. Co.,
 
 653 F.2d 1123, 1129 (7th Cir.1980). None of these sources indicates that New Jersey courts would extend the professional liability of architects as far as the district court did here.
 

 
 *18
 
 While there is some scholarly as well as precedential support for the position that an architect can be held liable for failing to provide certain information to his client, in each case the omitted information related to factors within the special knowledge of design professionals. For example, in J.
 
 Ray McDermott & Co. v. Vessel Morning Star,
 
 431 F.2d 714, 722 (5th Cir.1970),
 
 cert. denied,
 
 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218 (1972), the Fifth Circuit held that a naval architect had a duty to warn his client that design changes suggested by the client would have serious deleterious effects on the seaworthiness of the client’s vessels.
 
 See also
 
 Note,
 
 Design Professionals
 
 — Recognizing
 
 a Duty to Inform,
 
 30 Hastings L.J. 729 (1979). No New Jersey cases or articles dealing with New Jersey tort law and indeed no authority in any other state has suggested that architects have a responsibility to inform their client’s counsel that there are legal mechanisms for reducing risks associated with the bankruptcy of a contractor.
 

 The lack of case law or scholarly support might not be fatal if there were any evidence in the record, other than the unsupported opinion of the plaintiff’s expert witness, that Ewing, Cole had failed to meet the standards of a reasonably prudent professional in the field. If there were, for example, evidence that architects regularly inform their clients of risks such as those present here, or if some disinterested or independent body had stated that they should so inform their clients, this would be a different case. But there is no such indication of a trend toward the expansion of the liability of architects to include a duty to inform their clients about matters that have yet to be recognized as within the special expertise of design professionals.
 

 Finally, there are no special facts in this case that might lead a court to believe that it would be appropriate to extend the legal liability of professional architects. This case did not involve an unsophisticated or helpless consumer, nor was the omitted information ever solicited. The Authority is a government agency and was represented throughout the relevant negotiations by a Deputy Attorney General of New Jersey, who had extensive experience in construction. Deposition of Edward Schwartz at 2.12. Neither the government attorney nor the Authority ever indicated that they expected Ewing, Cole to point out potential legal pitfalls in the proposed arrangement with the contractor, and it is far from clear why an architect would believe that it had a duty to inform the legal counsel of its client about such matters. It seems an inefficient allocation of professional responsibilities to hold architects liable for not alerting lawyers to the legal ramifications of the bankruptcy of a contractor. We can see no reason under the facts of this case to predict that the New Jersey courts would impose such a duty.
 

 The decision of the district court will be reversed.
 

 [1]
 

 . “Both parties stipulate that as of the filing of a petition in bankruptcy by Stirling Homex, a total of $966,891 had been paid to that body by the EFA. A total sum. of $536,492 (less 10% retainage) had been requisitioned and paid on account of materials at the Stirling Homex plant to be incorporated into modules. In addition, a total sum of $488,000 (less 10% retain-age) was requisitioned and paid on account of completed modules. A total of $88,169 worth of materials was later incorporated into modules and this amount was credited to the EFA. Finally, the parties stipulate that a completed module cost $4,000. Thus, the breakdown is as follows:
 

 Material charge $536,492
 

 Less 10% retainage 53,649 $482,843
 

 Module charge $488,000
 

 Less 10% retainage 48,800 $439,000
 
 *
 

 Materials credit _ (88,169)
 

 Total paid for materials and modules 833,874
 

 98 modules delivered ($4,000 per module) (392,000)
 

 Total paid for undelivered materials and modules $441,874”
 

 App. at a-48.
 

 *It appears that there is a typographical error in the district court’s opinion and that this number should be 439,200. With this correction all other figures are consistent.