**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

09-3643
_____

UNITED STATES OF AMERICA,
Appellant

v.

ALLEN BROWN, a/k/a ALLAN BROWN,
Appellee
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

District Court Criminal No. 2:08-cr-00299-001

District Judge: The Honorable Terrence F. McVerry
_____

Argued June 21, 2010

Before: SMITH, FISHER, and COWEN, *Circuit Judges*.

(Filed: January 20, 2011)

Rebecca R. Haywood, Esq. (Argued)

Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

       Counsel for Appellant

Elisa A. Long, Esq. (Argued)
Marketa Sims, Esq.
Office of the Federal Public Defender
1001 Liberty Avenue
1550 Liberty Center
Pittsburgh, PA 15222

       Counsel for Appellee

_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge*.

Defendant Allen Brown stands indicted on charges of bank robbery, 18 U.S.C. § 2113(a), and armed bank robbery, 18 U.S.C. § 2113(d). The District Court granted Brown's motion to suppress a sample of his DNA, on the ground that it had been obtained by way of a materially and recklessly false warrant affidavit, in violation of the Fourth Amendment as interpreted by *Franks v. Delaware*, 438 U.S. 154 (1978). The United States appeals. We have jurisdiction, 18 U.S.C. § 3731, and will affirm.

I

On the morning of October 1, 2007, two men wearing distinctive "Scream" masks[1] robbed an S&T Bank branch in Ford City, Pennsylvania at gunpoint, absconding with more than $24,000. The robbers initially fled the scene on foot, running about 150 yards to the Armstrong County School District Administration Building. There they made off with a school district van that an employee had left with the engine idling.

Thirty minutes after the robbery, police found the van abandoned on Hobson Drive near Route 66, a half-mile from the administration building. Investigators later discovered a Scream mask containing DNA material inside the van. Witnesses reported seeing a silver Volkswagen Jetta driving in the area of Hobson Drive and Route 66 on the morning of the robbery. One witness had seen a silver Jetta parked in the area of Hobson Drive and Route 66 around the time of the robbery. A different witness had seen a silver Jetta driving southbound on Route 66 after the robbery had occurred. Two witnesses described the Jetta as having white license plates; one of them specified that the plates were from Maryland.

---

[1] The mask is named for the 1996 Wes Craven horror film that popularized the design; its ghostly appearance recalls Edvard Munch's painting *The Scream*. Such masks are commonly used as disguises by robbers and other criminals. *See, e.g.*, Edecio Martinez, *"Scream" Mask-Wearing Bandit Attempts Dunkin' Donuts Heist on Long Island* (Oct. 12, 2010, 8:14 a.m.), http://www.cbsnews.com/8301-504083_162-20019229-504083.html.

One of the bank tellers who had been present during the robbery advised Pennsylvania State Trooper Shane Lash that she and her co-workers had recognized one of the robbers' voices as belonging to John Wingate, one of the bank's regular customers. A Wingate acquaintance informed Lash that Wingate has a nephew who goes by the name "Dink" or "Dinky," owns a silver Jetta, and visits Ford City frequently. Another acquaintance stated that he had seen "Dink," Wingate, and a third man together at a Ford City gas station on the Saturday before the robbery. "Dink," Lash learned, is Allen Brown's nickname.

When Lash eventually contacted Wingate himself, he acknowledged that his nephew lived in Temple Hills, Maryland, and had visited in mid-September 2007, but insisted that the nephew had not been in Ford City on or around October 1. Lash remained suspicious, and asked FBI Special Agent Robert Smith to have his colleagues investigate Brown's Maryland residence. Baltimore-based Special Agent James Mollica interviewed Brown's mother, who stated that her son had been visiting Wingate in Ford City at the end of September, and confirmed that he owned a silver Jetta. Wingate later admitted to Lash that Brown had in fact visited him around the date of the robbery. He further stated that Brown had gone out in his Jetta around 8:00 a.m. on October 1 to buy groceries, and had returned around 10:00 a.m.

At this point the investigation was focused on Brown. Lash and Smith decided to seek a DNA sample in the hope that they could match it to the material found on the Scream mask. This would require a warrant, so Smith requested that an Assistant United States Attorney in Pittsburgh assist him in

4

preparing an application and affidavit. Smith had not participated in interviewing the witnesses who had seen the Jetta, so Lash filled him in via telephone and provided him with the written reports that had been generated during the investigation. Smith did not read any of the written witness statements, and did not review the investigation reports in any detail. Nevertheless, with the AUSA's help, he prepared an affidavit in support of a warrant application.

The affidavit contained only an abbreviated recitation of the known facts of the case. It mentioned the robber's use of a Scream mask; the stolen van and the mask found inside; the fact that Brown had been visiting Ford City around the time of the robbery; and Wingate's statement that Brown had left his home, driving a silver Jetta, at 8:00 and returned at 10:00. Finally, Paragraph 7(c) of the affidavit contained the following averment:

> Police interviews of various witnesses following the robbery reported witnessing the stolen Armstrong County School District Administration van meet up with a silver Volkswagen Jetta having a possible Maryland registration. Witnesses then observed the silver Jetta drive away from the area where the van was left parked.

After the AUSA had finished preparing the affidavit, Smith neither checked the affidavit's contents against the investigation reports nor asked Lash to review its accuracy. Smith sent the affidavit off to Mollica, who signed and presented it to a federal magistrate judge as being true and

correct to the best of his knowledge. The magistrate issued the warrant, and after obtaining Brown's DNA, investigators matched it to the material that they had found on the Scream mask.

Paragraph 7(c) was false. At the *Franks* hearing conducted pursuant to Brown's suppression motion, Lash testified that he never told Smith that "various witnesses" had seen the van "meet up" with the Jetta. Nor was there the sort of unbroken chain of observations conveyed by the claim that "[w]itnesses *then* observed the silver Jetta drive away." As the District Court wrote in its opinion granting Brown's motion to suppress, Paragraph 7(c) "appears to be crafted to give the U.S. Magistrate Judge the false impression of a continuous sequence of events observed by a number of witnesses." *United States v. Brown*, 647 F. Supp. 2d 503, 511 (W.D. Pa. 2009). The court went on: "Agent Smith . . . incorrectly concluded that non-existent evidence actually existed, and, more importantly, took the affirmative step of purposely incorporating the non-existent evidence into the affidavit." *Id.* at 513.[2] Because the challenged statement had no basis in the evidence, the District Court held that Agent Smith had acted with reckless disregard for the truth. *Id.* In accordance with *Franks*, the court proceeded to excise the false statement and reassess the affidavit's contents:

---

[2] The District Court also found that Smith had recklessly omitted various facts from the affidavit. Because these omissions do not affect our resolution of the case, we have no need to discuss them.

6

> Without [Paragraph 7(c)], the affidavit is essentially reduced to the following facts: that on the morning of the robbery, Defendant left the residence of John Wingate "at around 8 a.m." in a silver or gray Volkswagen Jetta, and returned at "10 a.m., or thereabout" with Perry Bell.

*Id*. The absence of any observation of the "meet-up," the court concluded, "eviscerate[d] probable cause." *Id*. Accordingly, the court held that that evidence obtained through the execution of the warrant must be excluded from trial. *Id*. (citing *Franks*, 438 U.S. at 155–56). The government timely appealed, requesting that we overturn the District Court's suppression order.

## II

*Franks* requires suppression of evidence obtained pursuant to a warrant issued on the basis of a false statement that was both material to the finding of probable cause and made either knowingly and intentionally or with reckless disregard for the truth.[3] 438 U.S. at 155–56. The government

---

[3] Although Smith did not sign the affidavit himself, and was not the source of the information on which the affidavit was based, both his conduct and that of the officers working upstream from him are relevant to our assessment of whether the affidavit was drafted knowingly and intentionally or with reckless disregard for the truth. *See United States v. Shields*, 458 F.3d 269, 276–77 (3d Cir. 2006) ("[I]t is beyond question that the police cannot insulate a deliberate falsehood from a *Franks* inquiry simply by laundering the falsehood through an unwitting affiant who is ignorant of the falsehood.");

concedes that Paragraph 7(c) was both false and material, [4] and Brown likewise concedes that the police did not act knowingly and intentionally. The only question on appeal is whether Smith's conduct evinces a reckless disregard for the truth. The District Court's articulation of the definition of recklessness (What does it mean, in the abstract, to act with reckless disregard for the truth?) is a purely legal question subject to plenary review. *See United States v. Shields*, 458 F.3d 269, 275–76 (3d Cir. 2006). The application of that standard to the facts of a given case (Did the behavior of the officers in this case rise to the level of recklessness?) is a mixed question of law and fact, as to which this Court has not

---

*United States v. Calisto*, 838 F.2d 711, 714 (3d Cir. 1988) (holding that the conduct of officers who relayed facts to the affiant was relevant to the *Franks* inquiry).
[4]

If the issue had been raised, we would affirm the District Court's holding with respect to materiality. That conclusion is a legal one reviewed de novo. *See, e.g.*, *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003). The question is whether, after the offending language is removed, the affidavit's four corners still contain sufficient evidence to support a finding of probable cause. *Franks*, 438 U.S. at 156; *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000); *cf. United States v. Zimmerman*, 277 F.3d 426, 431 n.3 (3d Cir. 2002) ("We, of course, must confine ourselves to the facts that were before the issuing magistrate—in other words, the affidavit."). What little is left after excision is insufficient to establish a "fair probability that . . . evidence of a crime will be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quoting *United States v. Jones*, 362 U.S. 257, 271 (1960)), because it does not connect Brown's Jetta to the stolen van, and there is nothing else from which the magistrate could have inferred that Brown committed the robbery.

8

yet articulated the proper standard of review. We now join the unanimous voice of our sister courts of appeals[5] in holding that a district court's resolution of the question whether a particular false statement in a warrant affidavit was made with reckless disregard for the truth is subject to reversal only upon a finding of clear error.

In *Miller v. Fenton*, 474 U.S. 104, 114 (1985), the Supreme Court explained that "in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *See also* Edwards & Elliott, Federal Standards of Review § I.D (West 2007). De novo

---

[5]

*See United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010); *United States v. Robinson*, 546 F.3d 884, 889 (7th Cir. 2008); *United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008); *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007); *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003); *United States v. Kyllo*, 190 F.3d 1041, 1045 (9th Cir. 1999), *rev'd on other grounds*, 533 U.S. 27 (2001); *United States v. Owens*, 167 F.3d 739, 747 (1st Cir. 1999); *United States v. Vanness*, 85 F.3d 661, 662–63 (D.C. Cir. 1996); *id.* at 664 (Tatel, J., concurring) (joining the panel's conclusion "that the district court did not commit clear error in finding that the detective on whose affidavit the search warrant was based did not knowingly or recklessly include a false statement in his affidavit"); *United States v. Falls*, 34 F.3d 674, 681–82 (8th Cir. 1994); *United States v. Cancela*, 812 F.2d 1340, 1343 (11th Cir. 1987). Reflecting its limited jurisdiction, the Federal Circuit has yet to cite *Franks* in a majority opinion.

review is favored where there is a need for appellate courts to control and clarify the development of legal principles, and where considered, collective judgment is especially important. *Ornelas v. United States*, 517 U.S. 690, 697 (1996); Edwards & Elliott, *supra*, at § I.D. By contrast, issues involving assessments of witness credibility and juror bias are wrapped up in evaluations of demeanor that a trial judge is in a better position to decide; appeals courts therefore defer to district court factfinding in the absence of clear error. *Miller*, 474 U.S. at 114–15.

The Ninth Circuit provided a valuable excursus on these principles in *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984) (en banc). The question was whether a district court's finding that exigent circumstances justified a warrantless search was subject to de novo or clear-error review. The court began by setting out the basic framework just discussed: factual findings are reviewed only for clear error because the trial court is in a "superior position to evaluate and weigh the evidence," and because sound allocation of resources favors relieving appellate courts of the burden of undertaking "full-scale independent review and evaluation of the evidence." *Id.* at 1201 (citation and internal quotation marks omitted). Conversely, appellate courts are freer to consider legal questions carefully because they are not required to expend time hearing evidence. In addition, the "collaborative, deliberative process of appellate courts reduces the risk of judicial error on questions of law." *Id.* Furthermore, because stare decisis has the effect of binding persons who are not parties to an individual lawsuit, sound judicial administration favors the concentration of appellate efforts on ensuring correct legal determinations. Factual

10

findings bind only the parties before the court, have little effect on the world at large, and accordingly are less in need of close appellate review. *Id.*

The appropriate standard of review for mixed-question cases is determined by reference to the underlying principles of sound judicial administration:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual"—one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct"—the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

*Id.* at 1202 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982); *Comm'r v. Duberstein*, 363 U.S. 278, 289 (1960)). This calculus will generally favor de novo review, "because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles." *Id.*

11

As examples, the court cited cases in which de novo review applied to trial-court conclusions that the defendant's conduct had not constituted a conspiracy in violation of the Sherman Act, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 141 n.16 (1966), and that a transaction did not fall within a particular provision of the Internal Revenue Code, *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 491 (1937). *See McConney*, 728 F.2d at 1202–03. Both cases involved the construction and application of legislation, and thus required the exercise of considered legal judgment. *McConney* itself likewise concluded that de novo review applies to a determination regarding the existence of exigent circumstances, because resolution of the question "requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests"—a process that "necessarily involves us in an inquiry that goes beyond the historical facts." *Id.* at 1205.

Crucially for our purposes, the en banc Ninth Circuit was at pains to point out that there are exceptions to the "general predominance of factors favoring de novo review." *Id.* at 1203. Relevant here is the court's explanation that some mixed questions involve a "strictly factual test," such that once the test is stated no legal reasoning is necessary to the resolution of the issue. *Id.* The considerations related to legal correctness and the development of precedent thus carry diminished weight. At the same time, the factual nature of the determination favors the trial court's experience and first-hand observation of testimony and other evidence. The primary example of this sort of mixed question put forth by the *McConney* court was state of mind, with specific reference to *Pullman-Standard*'s discussion of "actual motive" under

12

Title VII of the Civil Rights Act of 1964. The *Pullman-Standard* Court distinguished "actual motive" from "some legal concept of discriminatory intent," and concluded that the former is a "pure question of fact" to be reviewed for clear error. 456 U.S. at 289, 290.[6]

---

[6] The second mixed question identified by the Ninth Circuit as being subject to clear error review was whether established facts constitute negligence: Because adjudication of negligence requires applying "the data of practical human experience" in order to determine the meaning of reasonableness under prevailing community standards, "the trial court's findings of fact effectively determine [the appellate court's] legal conclusions." *McConney*, 728 F.2d at 1204 (citations omitted). On this point the court noted its disagreement with some other circuits, *id.* at 1204 n.11 (citing *Great Atl. & Pac. Tea Co. v. Brasileiro*, 159 F.2d 661, 665 (2d Cir. 1947)), and indeed it appeared at one time that this Court might have been one of those with which the Ninth Circuit disagreed. *See Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981) ("An ultimate fact is usually expressed in the language of a standard enunciated by case-law rule or by statute, e.g., an actor's conduct was negligent . . . .") (citation omitted). We have now, however, repeatedly reaffirmed that "[a] finding of negligence is, as a general rule, considered a finding of fact reviewable by an appellate court under the clearly erroneous standard." *Travelers Indem. Co. v. Ewing, Cole, Erdman & Eubank*, 711 F.2d 14, 17 (3d Cir. 1983) (citing *Sun Oil Co. v. Humble Oil & Ref.Co.*, 431 F.2d 1119 (3d Cir. 1970); Wright & Miller, Federal Practice and Procedure § 2590 (1st ed. 1971 & Supp. 1983)); *En Hui Huang v. Att'y Gen.*, 620 F.3d 372, 385 (3d Cir. 2010). Our jurisprudence on this question falls neatly in line with the Ninth Circuit's account.

13

Applying this functional analysis, our task in this case is to ask whether recklessness under *Franks* is an "essentially factual" question about an officer's state of mind. *Pullman-Standard*, 456 U.S. at 288. If so, the principles of judicial administration favor deferential review of the District Court's conclusions. In this Circuit, the rule is that "[a]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (citations omitted). This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind. Neither prong involves the application of legal reasoning or judgment. The judge is not asked to construe a statute's text or to assess its purpose in order to ascertain whether an affiant's actions are covered. The test simply asks the court to discern whether "serious doubts" or "obvious reasons" existed. The answer to each of those questions is a matter of fact. Serious doubts exist or they do not; a reason for doubt exists or it does not and is obvious or is not. If either question posed in *Wilson* is answered affirmatively, nothing further need be asked before the officer is found reckless. Thus the *Franks* recklessness determination is an "essentially factual" inquiry. [7]

---

[7]

Two related observations warrant mention. First, under *Franks* the more egregiously impermissible state of mind is "knowingly and intentionally." 438 U.S. at 155. This Court has not developed any technical legal definition of this phrase, which is

14

Analysis of the specific considerations underlying the *Miller-McConney* framework confirms this conclusion. First, ascertaining the existence of "serious doubts" is likely to turn in substantial part on observations of the demeanor during the *Franks* hearing of (*inter alia*) the allegedly reckless officer himself. The trial judge is better positioned than the judges on an appellate panel to evaluate an officer's honesty when he testifies, "No, Your Honor, I didn't entertain serious doubts about the accuracy of that statement I made under oath." Similarly, what is obvious in a given case will frequently depend on background circumstances and facts about the community, of which a trial judge is more apt to be aware than an appellate panel. Recklessness determinations are also likely to be highly fact-dependent, and thus to carry little precedential value: decisions will typically turn on what a particular officer did and either knew or should have known. Review of such determinations does not warrant substantial expenditure of appellate resources, because the answers to the questions presented will not be of much use in future cases

---

analogous to *Pullman-Standard*'s "actual intent" inquiry. *See* 456 U.S. at 289–90. As in *Pullman-Standard*, a district court's conclusion regarding the knowing and intentional character of an affiant's actions is a factual finding reviewable only for clear error. It would be incongruous to treat recklessness differently, given that it is just another prong of the same test.

Second, in order to obtain a *Franks* hearing a defendant is required to establish his "allegation of perjury or reckless disregard . . . by a preponderance of the evidence." *Franks*, 438 U.S. at 156. Facts, not legal rulings, are determined in accordance with the preponderance standard, and once found they are reviewed for clear error. *See, e.g.*, *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2006) (en banc).

15

with different fact patterns. The overarching goals of judicial administration thus favor affording deference to the trial court's findings.

One potential objection requires an answer. In *Miller*, the Supreme Court specifically cited "proof of actual malice in First Amendment libel cases" as one instance where "the relevant legal principle can be given meaning only through its application to the particular circumstances of a case," so that de novo review is appropriate. 474 U.S. at 114. Because the courts have derived the *Franks* recklessness standard from First Amendment actual malice cases,[8] one might contend that de novo review should apply here as well.

The response to this argument begins with the observation that "actual malice" is merely a term of art that encompasses several different culpable states of mind; the inquiry is just as factual in nature as the assessment of "actual motive" in *Pullman-Standard*. Ticking off the elements requires no legal judgment. The Supreme Court said as much in the case that is the ultimate source of *Wilson*'s recklessness standard: "The defendant in a defamation action brought by a

---

[8]  The genealogy is as follows: *Wilson* cited *United States v. Clapp*, 46 F.3d 795, 801 & n.6 (8th Cir. 1995); *Clapp* cited *United States v. Dorfman*, 542 F. Supp. 345, 369 (N.D. Ill. 1982), *aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003 (1985); and *Dorfman* cited *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979). *Davis* imported into the Fourth Amendment context the Supreme Court's First Amendment reckless-disregard jurisprudence, as articulated in *St. Amant v. Thompson*, 390 U.S. 727 (1968).

16

public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. *The finder of fact must determine whether the publication was indeed made in good faith*." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (emphasis added). Good faith determinations under the First Amendment (and hence under the Fourth) are rendered, in the first instance, by the finder of fact. They are thus, necessarily, "essentially factual" in nature.

Why, then, is the First Amendment actual malice question subject to close appellate scrutiny? The answer lies in its importance to the preservation of an enumerated constitutional right. The *Miller* Court's observation that actual malice is subject to de novo review was grounded in a citation to *Bose Corp. v. Consumers Union*, 466 U.S. 485, 503 (1984). In *Bose*, the Court relied heavily on statements in case law to the effect that in cases in which constitutional values—specifically, First Amendment values—are at stake, the appellate courts play a special role in "mak[ing] sure that [the actual malice rule] is correctly applied." *Id.* at 502. The constitutional nature of the right being protected made the difference in the Court's decision to review an assessment of state of mind—ordinarily a factual issue—de novo.

But, an objector might respond, although this case does not deal with the First Amendment, it does involve the Fourth. Is that not enough? The answer is "No," for in fact there is no constitutional right at stake here: the exclusionary rule is merely a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974).

17

In contrast, *Bose* involved the personal right to speak freely. Thus, "[t]he requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law," adopted as part and parcel of the Court's protection of both individual acts of speech and the entire marketplace of ideas. *Bose*, 466 U.S. at 510–11. Whereas a libel judgment entered in the absence of actual malice works a First Amendment wrong, admission at trial of "fruits of a past unlawful search or seizure '[works] no new Fourth Amendment wrong.' The wrong condemned by the Amendment is 'fully accomplished' by the unlawful search or seizure itself . . . ." *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Calandra*, 414 U.S. at 354). Moreover, the Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 129 S. Ct. 695, 700 (2009) (citing *Leon*, 468 U.S. at 905–06; *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998); *Arizona v. Evans*, 514 U.S. 1, 13–14 (1995)). The presence or absence of recklessness has no bearing on the defendant's constitutional rights, which are violated, if at all, by the execution of a warrant obtained through the use of a materially false application. The recklessness inquiry goes only to the determination whether a particular violation is of a sort that is so in need of deterrence that the exclusionary remedy is merited. *See Herring*, 129 S. Ct. at 702 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

18

The considerations that led the *Bose* Court to engage in heightened appellate scrutiny do not come into play in a *Franks* recklessness case, because in such a case the court is faced only with a garden-variety factual inquiry that does not directly affect anyone's constitutional rights.[9] We therefore hold that clear-error review applies to the District Court's finding that Smith acted recklessly.

III

Before assessing whether the District Court's conclusion was clearly erroneous, we pause to observe that Judge McVerry correctly explicated this Circuit's recklessness standard. The court properly cited *Wilson* for the proposition that "[a]ssertions are made with a reckless disregard for the truth when, after viewing all of the evidence, an officer must have entertained serious doubts as to the truth

---

[9]

To the extent that a *Franks* case does implicate constitutional values, it should be noted that *Miller* made clear that the presence of a constitutional question does not automatically require that a mixed question be reviewed de novo. When, for instance, "the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court." *Miller*, 474 U.S. at 114. Thus, "juror bias merits treatment as a 'factual issue' . . . notwithstanding the intimate connection between such determinations and the constitutional guarantee of an impartial jury." *Id.* at 114–15; Edwards & Elliott, *supra*, at § I.D. As we have already observed, the recklessness inquiry will frequently involve evaluations of demeanor and credibility, which are, like the assessment of juror bias, best suited to the competencies of the trial court.

of what was being asserted or had obvious reasons to doubt the accuracy of the information which he was asserting." 647 F. Supp. 2d at 512 (citing *Wilson*, 212 F.3d at 788). Recklessness, the court went on, "is measured by the conduct of the investigating officer(s)." *Id.* The government argues that the court in fact applied a negligence standard, rather than the proper recklessness test, on the basis that its opinion "faults Agent Smith, not for including a statement about which he 'must have entertained serious doubts,' but for not having taken investigatory steps that would have led him to the truth." In the government's view, the District Court's statement that "[t]o have asserted the existence of [nonexistent] evidence in the face of readily available access to actual evidence to the contrary was a reckless disregard for the truth," *id.* at 513, gives away the game by implying that Smith's error was his failure to confirm his statement. After all, it is clear that, "in general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth." *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993).

We read the opinion differently. As we see it, the major flaw identified by the District Court is not negligence in reviewing the evidence but rather Smith's conclusion "that non-existent evidence actually existed, and, more importantly, [his decision to take] the affirmative step of purposely incorporating the non-existent evidence into the affidavit." 647 F. Supp 2d at 513. The existence of contradictory evidence highlighted the problem with Smith's affidavit, but (according to the District Court) Smith's reckless disregard for the truth occurred when he made up Paragraph 7(c) out of whole cloth. Such a fabrication, in the District Court's view,

20

would justify invocation of the exclusionary rule regardless of whether or not police are in possession of evidence giving it the lie.

We agree with the District Court's opinion, so understood. The underlying theory is that, ordinarily, a person does not believe something to be true (let alone swear in an affidavit that it is "true and correct to the best of my knowledge, information, and belief") without an affirmative justification. That justification might come in the form of first-hand observation, or from information provided by a third party, or from some textual source, but we do not take seriously someone who claims that X is true but cannot provide any reason for thinking it so. In other words, a reasonable person's default position is to doubt that a proposition is true until there are grounds to believe it. The absence of sufficient grounding to support an averment therefore constitutes an "obvious reason[] for doubt" under *Wilson*, 212 F.3d at 788, allowing the court to infer that an affiant acted with reckless disregard for the truth. *Cf., e.g.*, *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (observing that a "factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations") (quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984) (quoting *St. Amant*, 390 U.S. at 731)). The First Amendment case from which the reckless disregard standard is drawn makes this clear:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by

21

testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. *Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.* Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732 (emphasis added).[10]  The fact that

---
[10]

    The *St. Amant* Court delineated several valid bases for inferring that a speaker did not act with good faith, of which "obvious reasons [for] doubt" was but one.  *Wilson* and other cases importing the *St. Amant* standard into the Fourth Amendment context have folded the other bases into the catch-all "obvious reasons," so that fabrication, being a figment of one's imagination, having been made on the basis of an unverified anonymous tip, and inherent improbability should all be understood as subsets of the set of possible circumstances that can constitute "obvious reasons to doubt" a statement's veracity.  Any of these circumstances is sufficient to allow an inference that the affiant acted with reckless disregard for the truth.

    This reading of the case law is borne out by a perusal of the genealogy outlined in note 8, *supra*.  The language of our test ("viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported," *Wilson*, 212 F.3d at 788) is taken from *Clapp*, 46 F.3d at 801 & n.6; *Clapp* quoted *Dorfman*, 542 F. Supp. at 369; and *Dorfman* cited *Davis*, 617 F.2d at 694.  *Davis* compressed the above block-quotation from *St. Amant* thusly:

> [T]he Court observed that reckless disregard for the truth requires a showing that the defendant "in fact entertained serious doubts as to the truth of his publication."  This subjective test may be met not only by showing actual deliberation but also by demonstrating that there existed "obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

617 F.2d at 694 (quoting *St. Amant*, 390 U.S. at 731, 732).  The D.C. Circuit's summary omits the bulk of the paragraph from which the "obvious reasons" language is taken.  We understand this move as a

23

a statement is a fabrication or a figment of a speaker's imagination is sufficient reason for finding that it was not made in good faith—*i.e.*, that it was made with (at least) reckless disregard for the truth—even if the speaker testifies that he believed the statement to be true. Although the District Court did not clearly articulate this epistemological conception of recklessness, such a theory lies at the heart of its ruling.

This comports with *Herring*'s holding that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 129 S. Ct. at 702. The invention of baseless averments is plainly the sort of behavior that exclusion can be expected to deter: an officer wishing to avoid suppression need only look at the evidence before him and determine whether it backs up his affidavit, or communicate with another officer who has sufficient grounds for establishing a belief in the matter in question. He need not waste his time on needlessly duplicative fact-checking; all that is required is that his belief in the facts to which he swears have a sufficient grounding. This is also a brand of behavior worth deterring: the idea of a police officer fabricating facts or even entire affidavits in order to obtain probable cause is quite obviously repugnant to the Fourth Amendment. To hold that an officer cannot be found reckless unless he actually possesses information contradicting his

distillation of the Supreme Court's discussion, rather than as an effort to eliminate several of the approved grounds for inferring recklessness.

24

averment would be to grant license to do just that. Police should be expected to collect and review evidence before seeking a warrant to invade a citizen's home and person, and should not be permitted to rely on unsubstantiated hunches. Accordingly, we hold that a court may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it.

IV

As our dissenting colleague emphasizes, Smith "believed that the information in the affidavit was accurate at the time he drafted it," and thus did not *knowingly* make his false statement. But that is not the end of the *Franks* test. [11] The question here is whether Smith's statement was made with reckless disregard for the truth, or whether he acted only negligently. For we are mindful that, "[u]nder *Franks*, negligent police miscommunications in the course of acquiring a warrant do not provide a basis to rescind a warrant and render a search or arrest invalid." *Herring*, 129 S. Ct. at 703. Had Smith merely negligently misheard Lash, or had Lash negligently misspoken, *Herring* would control. Because

---

[11] For this reason, our colleague's observation, that "[i]t is actually implausible to surmise that [Smith] would have acted in such an unreasonable and even surprising manner given that the correct facts would have been more than sufficient to establish probable cause," is a red herring. The question before us is not knowledge or intent, to which motive or lack thereof would be relevant, but whether Smith entertained serious doubts or had obvious reasons to do so.

25

an affidavit that is only negligently false is not subject to excision under *Franks*, evidence collected under the auspices of a warrant supported by such an affidavit would not be subject to suppression.

In the case now before us, the District Court was on sound footing when it concluded that Smith's false assertion was not a result of merely negligent miscommunication. Smith did not claim that Lash specifically told him that witnesses saw the two vehicles meet up, and Lash testified that he did not tell Smith that he saw the vehicles meet. Smith's false averment had no basis in any of the materials with which he had been presented. He had no reason to believe that the statement in question was true. At the suppression hearing, he was unable to come up with any explanation of the origin of the false claim that multiple witnesses had observed the Jetta meeting up with the getaway van and then driving away. He essentially acknowledged that he had conjured Paragraph 7(c) out of thin air. *Contra* the dissent's assertion, Smith did not merely fail to corroborate his averment; he failed ever to develop any basis for it in the first place. Because the total lack of an evidentiary basis for making an averment can constitute an obvious reason for doubting that averment's veracity, the District Court did not clearly err in finding that Smith's conduct rose beyond the level of negligence, to the point of recklessness. We will affirm the suppression order.

*United States v. Brown,* No. 09-3643, dissenting.

COWEN, *Circuit Judge.*

Because the record does not support the District Court's determination that Smith acted with reckless disregard for the truth when he incorporated paragraph 7(c) into the warrant affidavit, I respectfully dissent.

As the majority correctly notes, we have previously explained that "[a]n assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (internal quotation marks and citation omitted). The majority also properly characterizes the recklessness inquiry as a *subjective* test, with the ultimate focus remaining on whether a finder of fact can either directly find or "infer a subjectively reckless state of mind." (Maj. Op. at 11.) "In applying the reckless disregard test to assertions, we have borrowed from the free speech arena and equated reckless disregard for the truth with a 'high degree of awareness of the statements' probable falsity.'" *Wilson*, 212 F.3d at 788 (citation omitted).

The majority concludes that the District Court's recklessness determination was proper because, in its view, the record supports the District Court's finding that Smith "made up Paragraph 7(c) out of whole cloth." (Maj. Op. at 17.) According to the majority, "[t]he fact that a statement is a fabrication or a figment of a speaker's imagination is sufficient reason for finding that it was not made in good

1

faith—*i.e.,* that it was made with (at least) reckless disregard for the truth—even if the speaker testifies that he believed the statement to be true." (Id. at 18-19.) While this statement of law is not incorrect in the abstract, the District Court in this case never specifically found that Smith had "fabricated" the disputed evidence or cut it "out of whole cloth."

The District Court's decision holds that Smith acted with reckless disregard for the truth because he failed to take any steps to verify his understanding of the evidence, which was based solely on his telephone conversations with Lash; in the District Court's view, for Smith "[t]o have asserted the existence of [non-existent] evidence in the face of readily available access to actual evidence to the contrary was a reckless disregard for the truth." *United States v. Brown*, 647 F. Supp. 2d 503, 513 (W.D. Pa. 2009). But as even the majority acknowledges, suppression is not warranted when an officer *negligently* includes a false assertion in a warrant affidavit, and the failure to conduct a full investigation does not constitute evidence of recklessness. *See, e.g., Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("[A]llegations of negligence or innocent mistake are insufficient" to warrant suppression); *see also Herring v. United States*, 129 S. Ct. 695, 703 (2009) ("Under *Franks*, negligent police miscommunications in the course of acquiring a warrant do not provide a basis to rescind a warrant and render a search or arrest invalid."); *United States v. Hammett*, 236 F.3d 1054, 1058-59 (9th Cir. 2001) (holding that misstatement in warrant affidavit was not made with reckless disregard for the truth because it was highly probable that there was a miscommunication between the investigating officer and the officer who drafted the affidavit); *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1994) ("[I]n general, the failure to

2

investigate fully is not evidence of an affiant's reckless disregard for the truth.").

Returning to the majority's "fabrication" theory, such a characterization has no real basis in the record (and, to the extent the District Court's decision could be construed as making any "fabrication" finding, such a finding would be clearly erroneous at least in the absence of any adverse credibility determination against Smith himself). For instance, although Smith ultimately acknowledged at the hearing that "Trooper Lash never told [him] that the Jetta met up with the school van," (App. 241), he also repeatedly testified that he had previously believed that the information in the affidavit was accurate at the time he drafted it. More significantly, he indicated that (in the words of the District Court itself) "[h]e based his statements in the affidavit on discussions which he had previously had with Trooper Lash." 647 F. Supp. 2d at 508. The District Court never specifically made a credibility finding against Smith or otherwise rejected any of his sworn testimony.

Accordingly, it is incorrect to assert that Smith had no basis or reason whatsoever for believing that the information included in the affidavit was true at the time the affidavit was drafted. He relied at that point in time on what he had remembered (and perhaps had inferred) from his prior conversations with Lash. As it turns out, he was wrong and acted negligently when he should have read the reports of Lash. However, Smith clearly did not irrationally "believe something to be true (let alone swear in an affidavit that it is 'true and correct to the best of my knowledge, information, and belief') without an affirmative justification." (Maj. Op. at 17.) It is actually implausible to surmise that he would have

3

acted in such an unreasonable and even surprising manner given that the correct facts would have been more than sufficient to establish probable cause.[1]  See Illinois v. Gates, 462 U.S. 213, 236-37 (1983) (explaining that "so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more") (internal quotation marks and citation omitted).  In particular, several witnesses saw a silver car parked where the van was later discovered, and one of those witnesses—who specifically identified the car as a Volkswagen Jetta—saw it again at 9:25 a.m. traveling away from the vicinity of the parked van.

I would reverse the order of the District Court and, accordingly, respectfully dissent.

---

[1]  I make this point in the limited context of assessing Smith's state of mind at the time the affidavit was drafted.