# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-50567
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**
January 17, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

    Plaintiff - Appellee

v.

ADOLFO ORTEGA,

    Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:13-CR-398-1

Before KING, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:*

    Adolfo Ortega was convicted for possession of cocaine and firearms uncovered during the execution of a search warrant. We vacated Ortega's conviction and sentence, and remanded his case for a *Franks* hearing—a chance for him to show that the search warrant's supporting affidavit contained an intentional or reckless false statement that if excised would

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-50567

destroy probable cause. *United States v. Ortega*, 854 F.3d 818, 829 (5th Cir. 2017). The sole issue on remand was whether a statement in the affidavit, which we deemed false, was made by the affiant with the requisite mental state. The district court found the statement was not made intentionally or recklessly, and thus rejected Ortega's *Franks* challenge and reinstated his conviction and sentence. This finding is free of clear error, and therefore we AFFIRM Ortega's conviction and sentence.

## I.

Adolfo Ortega was indicted for possession with intent to distribute 500 grams or more of cocaine and possession of a firearm in furtherance of a drug trafficking crime. After Ortega's motion to suppress the cocaine and firearms was denied, he pleaded guilty to both offenses pursuant to a plea agreement. Ortega's plea agreement preserved his right to appeal the suppression motion. He exercised that right after the district court sentenced him to 120 months' imprisonment.

In this first appeal, Ortega argued, among other things, that the search warrant whose execution revealed his cocaine stash and guns was invalid under *Franks v. Delaware*, 438 U.S. 154 (1978). Of paramount importance to that first appeal, and this one as well, was the warrant's supporting affidavit, created by San Antonio Police Officer Matthew Parkinson. Parkinson's affidavit stated:

> Affiant did on the 18th of April, 2013 receive information from a credible and reliable person who has on previous occasions given Affiant information regarding the trafficking and possession of controlled substances which has proven to be true and correct but whose identity cannot be revealed for security reasons.
> The said credible and reliable person stated that they did within the last 48 [hours] see a controlled substance, to wit Cocaine, in the possession of the aforesaid Defendant[ ] Ortega . . . inside the location at [the address for Ortega's house].

Parkinson's affidavit further stated that surveillance of Ortega's house revealed that an unspecified number of individuals would occasionally enter Ortega's house for short periods of time and then leave. Other individuals would make hand-to-hand exchanges at Ortega's front door with someone from the house. "These types of behaviors," according to Parkinson's affidavit, "are consistent with the buying and selling of narcotics."

Ortega attacked the veracity of part of Parkinson's affidavit—more precisely, the part where Parkinson swore that he had "receive[d] information" from an informant who had "on previous occasions given" him information which proved reliable. This argument had been raised below and rejected by the district court, after it held a suppression hearing where Parkinson testified.

We deemed the relevant statement false. Plainly read, the statement means that Parkinson conversed directly with the informant. Our review of the suppression hearing record revealed, however, that no proper conversation occurred. At most, Parkinson observed a fellow officer, Mario Jacinto, and the informant conversing in Spanish, a language in which Parkinson is not fluent. Jacinto would then translate the informant's message to Parkinson. We also held that were this false statement excised, the warrant would not be supported by probable cause. The reformed affidavit would not indicate that the tip was credible or support the allegation that cocaine could be found in Ortega's house.

But instead of reversing, we vacated and remanded. No finding of fact had been made on the question of Parkinson's intent. We declined to be the first court to rule on the issue. Accordingly, we vacated Ortega's conviction and sentence, and remanded to the district court with instructions to make a factual finding on Parkinson's intent.

No. 17-50567

On remand, the district court held another suppression hearing. Once again, Parkinson testified. Parkinson explained that when he submitted the affidavit in April 2013, he was at least a 13-year veteran of the San Antonio Police Department ("SAPD"). Parkinson, however, was new to the SAPD Gang Unit. He started working with the Gang Unit at the end of 2012 and was formally transferred at the start of 2013. When he started working for the Gang Unit, Parkinson heard from an informant—not the one referenced in relevant affidavit—that Ortega sold cocaine.

Because Parkinson had less than three years of experience as a detective and was the "the new guy" in the Gang Unit, he was assigned to work with other officers. One of those officers was Jacinto. While the pair worked together, one of Jacinto's informants told them that he had bought cocaine from Ortega. Parkinson testified that this same informant had previously provided him and Jacinto information that had led to cases and arrests.

Parkinson explained the nature and circumstances of these interviews with the informant. They occurred in the field and the office. When they occurred, Parkinson was close to the informant—"pretty much in his right pocket, right next to him."[1] The informant spoke mostly Spanish. Parkinson does not fluently speak Spanish—he cannot "speak long sentences"—and

---

[1] In Ortega's first appeal, we noted that the magistrate judge who presided over the first suppression hearing "surmised" that Parkinson "watched Jacinto interview [the informant] through a window in an interview room." *Ortega*, 854 F.3d at 827 n.9. Based on this, we postulated that "this does not appear to be a situation in which Jacinto was merely serving as a real time translator." *Id.* This conclusion, however, was not based on anything Parkinson said at the first suppression hearing. On remand, Parkinson clarified that he was not in a separate room. Accordingly, the district court held that the magistrate judge had "incorrectly suggested" that Parkinson was watching through a window. Ortega has not argued that we are bound to our prior discussion of the facts under the law of the case. We therefore find any such argument forfeited. *See United States v. Anderson*, 772 F.3d 662, 668 (11th Cir. 2014) (holding that law-of-the-case arguments may be forfeited) (citing 18B Charles Alan Wright et al., *Federal Practice & Procedure* § 4478, at 668–70 (2d ed. 2002)); *United States v. Scroggins*, 599 F.3d 433, 446–47 & n.8 (5th Cir. 2010) (holding that failure to adequately brief an issue results in forfeiture).

4

therefore could not ask questions. But Parkinson swore that he could understand some of what the informant said because he understands some spoken Spanish, like "names, addresses, drugs." Parkinson explained why this was the case. According to him, his wife and her family speak Spanish, Spanish is frequently spoken at his home, and he attends church services delivered in Spanish. To fill in the gaps of Parkinson's understanding, Jacinto would translate. Jacinto would tell Parkinson in advance what questions he would ask and then help Parkinson fill in the structure of the sentences when the informant would reply.

Parkinson also spoke to his intent when creating the affidavit. He stated that he believed the affidavit was truthful—he thought he had received the information from the informant because he was present when the information was conveyed and could understand some of what the informant was saying. He saw no need to explain that he and Jacinto worked together. He testified that he had not deliberately omitted the circumstances of the interview to secure the search warrant. He did admit that at the time he was filing out the affidavit there was no "need for a rush on anything." He also did not consult an attorney, but he did need the help of other officers to "get the lingo down."

Ortega called no witnesses at the second suppression hearing, but his attorney did cross-examine Parkinson. To impeach Parkinson, Ortega offered Parkinson's testimony from the first suppression hearing. There, Parkinson acknowledged that the informant was Jacinto's source and not his. Parkinson further stated that it was Jacinto who told him that the informant's past tips were reliable, and that he did not know how many times the informant had supplied credible information. Parkinson also had admitted that he did not speak Spanish, Jacinto translated, and only Jacinto asked questions.

Considering the evidence presented at both hearings, the district court rejected Ortega's renewed motion to suppress and reinstated the conviction

No. 17-50567

and sentence. It found that Ortega had not shown that Parkinson made the false statement intentionally or recklessly. Parkinson's testimony was "highly credible," according to the district court, and the court found that his testimony from the two hearings was generally consistent. It concluded that Parkinson "had an objectively reasonable belief that what he included in the affidavit was true and sufficient." Ortega once again appealed.

Ortega's current appeal presents us with a single question: whether Parkinson's false statement—that he received the informant's tip about Ortega and had previously received reliable information from that informant—was made intentionally or recklessly.

**II.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. With some limited exceptions, it requires police officers to secure a search warrant supported by probable cause prior to effecting a search or seizure. *See Alexander v. City of Round Rock*, 854 F.3d 298, 303 (5th Cir. 2017). Oftentimes, as is the case here, information supporting probable cause for the issuance of a warrant is provided by an affidavit created by a law enforcement officer. *See, e.g.*, *United States v. Baker*, 538 F.3d 324, 326 (5th Cir. 2008). Information within such affidavits is presumed valid and therefore generally not subject to challenge. *See United States v. Breckenridge*, 782 F.2d 1317, 1322 (5th Cir. 1986) (citing *Franks*, 438 U.S. at 171). But, upon a "substantial preliminary showing" that the affiant made "a false statement knowingly and intentionally, or with reckless disregard for the truth," and that "the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56. Once such a preliminary showing is made and a *Franks* hearing held, as happened here, to

void the warrant and exclude the fruits of the search the defendant must show three things by a preponderance of the evidence. The defendant must show that: (1) the affidavit contains a false statement, (2) the false statement was made intentionally or with reckless disregard for the truth, and (3) if the false statement is excised, the remainder of affidavit fails to establish probable cause. *See Ortega*, 854 F.3d at 826.

Presently, only the second element is at issue—whether Parkinson had the requisite mental state. We determined in Ortega's first appeal that he satisfied the first and third elements. *Id.* at 827–29. It is worth noting that Ortega's appeal presents a particular breed of *Franks* challenge. No current dispute exists over whether Parkinson justifiably believed the informant's underlying information. We resolved that question against Ortega in his first appeal. *See id.* at 827. Instead, the parties dispute whether Parkinson intentionally or recklessly misled the magistrate by overstating the extent of his personal knowledge—namely, that *he* "receive[d] information from" the informant who had "on previous occasions given" *him* information which proved reliable. For Ortega to prevail, he must show more than mere "negligence or innocent mistake" on Parkinson's part. *Franks*, 438 U.S. at 171; *see United States v. Runyan*, 290 F.3d 223, 234 n.6 (5th Cir. 2002).

Parkinson's precise mental state is a question of fact that we review for clear error. *See United States v. Looney*, 532 F.3d 392, 395 (5th Cir. 2008) (per curiam). Clear error occurs "if we are 'left with a definite and firm conviction that a mistake has been committed.'" *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) (quoting *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)). Where, as here, the district court heard live testimony, our review is particularly deferential. *See United States v. Tovar*, 719 F.3d 376, 384 (5th Cir. 2013). In addition to deferring to the district court's factual findings, "the court must view the evidence 'most favorably to the party

prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.'" *Scroggins*, 599 F.3d at 440 (quoting *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)). Thus, the district court's ruling "should be upheld 'if there is any reasonable view of the evidence to support it.'" *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999) (quoting *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993)).

With this, we turn to the core of the controversy. We see no basis for overturning the district court's finding that Parkinson lacked an intent to mislead. Such a finding is reasonably supported by the record. At the second suppression hearing, Parkinson said that he believed his affidavit was truthful. He also swore that he did not deliberately misrepresent anything in order to secure a warrant. The district court, hearing this live testimony and at times directly asking Parkinson questions, found his testimony highly credible. We will not disturb this conclusion. *See Tovar*, 719 F.3d at 384.

But even though we see no reason for disturbing the district court's finding on intent, our inquiry is not at an end. Even if Parkinson was not cunning, he may have been careless to the point of being reckless. Such recklessness may be shown circumstantially "when reasons to doubt [the] information's veracity are obvious." *United States v. Tomblin*, 46 F.3d 1369, 1376 (5th Cir. 1995) (citing *United States v. Williams*, 737 F.2d 594, 602 (7th Cir. 1984)); *see United States v. Newton*, 463 F. App'x 462, 465 (5th Cir. 2012) (per curiam) (finding the affiant not reckless when "nothing obvious under the circumstances" would have caused the affiant to doubt the truthfulness of the affidavit); *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (recklessness inferred if "obvious reasons" to doubt the information existed); *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (same); *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (same); *United States v. Davis*,

617 F.2d 677, 694 (D.C. Cir. 1979) (same). We ultimately conclude that the district court did not clearly err when it found that Parkinson's statement was made without reckless disregard for the truth.

Factoring into our conclusion, but certainly not compelling it, is our confidence that "[t]his entire problem could have been avoided if [Parkinson] had simply rewritten the affidavit." *See United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983). As previously noted, "Parkinson had no obvious motivation to lie." *Ortega*, 854 F.3d at 829. A rewritten affidavit, admitting that Jacinto translated the informant's Spanish, would almost certainly survive judicial scrutiny. *See United States v. Ventresca*, 380 U.S. 102, 111 (1965). Indeed, Ortega previously conceded just this point. *See Ortega*, 854 F.3d at 829.

We have frequently noted that a statement or omission's materiality, or lack thereof, has bearing on whether the affiant was reckless. *See Tomblin*, 46 F.3d at 1377 (declining to find that an omission was intentional or reckless "because the balance of the information submitted in the affidavits is more than sufficient on its own to establish probable cause"); *United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982) (noting that "the analytical concepts of materiality and recklessness are often bound together"); *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (holding that the omitted facts "were not so central as to warrant the inference that [the affiant's] actions were reckless"); *see also United States v. Patterson*, Nos. 16-1357, 16-1702, 2017 WL 6349262, at *4–5 (1st Cir. Dec. 13, 2017) (holding that the affiant's misstatement was not done intentionally because an accurate statement would still have provided "ample" basis for issuance of a warrant). Put simply, the less damaging the whole truth is to the affiant, the weaker the inference that the affiant made a statement or omission with reckless disregard for the truth.

That said, we are cautious not to rely solely on this factor. The fact that Parkinson could have written a wholly truthful and sufficient affidavit cannot,

No. 17-50567

by itself, defeat Ortega's *Franks* challenge. *See Davis*, 714 F.2d at 899. In fact, Parkinson's failure to disclose facts underlying conclusory statements in his affidavit is a factor favoring recklessness, though not a dispositive one. *See United States v. Alvarez*, 127 F.3d 372, 374–75 (5th Cir. 1997). After all, "it is the magistrate," and not the police, "who must determine independently whether there is probable cause." *Franks*, 438 U.S. at 165. It may have been eminently reasonable for Parkinson to infer that Jacinto was accurately translating the informant's message. But the Fourth Amendment requires that "those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13–14 (1948).

The factor we find most important in this case that weighs against finding recklessness is the plausibility of Parkinson's understanding of his affidavit. As we previously noted, the most natural reading of the affidavit is that Parkinson and the informant directly conversed, without a translator or a language barrier. That said, Parkinson's proffered reading is not so obviously false that it amounts to a reckless disregard for the truth. *Franks* itself is instructive. There, the affiant swore that he contacted two witnesses and "did have personal conversation with both." *Franks*, 438 U.S. at 157. The defendant proffered testimony from both witnesses, who said they were never personally interviewed by the affiant but might have talked to a different officer. *Id.* at 158. There, it would have been obviously false to say that the officer had a "personal conversation" with a witness with whom he had never spoken. Here on the other hand, it is a slight stretch but not totally baseless for Parkinson to say he "receive[d] information" when he was present while it was conveyed, understood some of it, and had the rest translated to him.

Our cases confirm that the plausibility of the affiant's proffered interpretation weighs in favor of mere negligence and against recklessness. In

*Alvarez*, the affiant swore that he had received information that the defendant had produced a video tape showing a minor "engaging in sexual conduct." 127 F.3d at 373. This statement was false. *Id.* at 374. What the affiant really had was information that a minor exposed her breasts on the tape. *Id.* at 373. Exposing breasts fell outside of Texas's definition of "sexual conduct," which, in relevant part, included "lewd exhibition of the genitals." *Id.* at 373–74. At the suppression hearing, the affiant testified that he believed breasts were genitals. *Id.* at 374. We refused to chalk this basic misunderstanding of human anatomy up to mere negligence and instead held that the statement was made with reckless disregard for the truth. *Id.* at 375. In *Namer*, the affidavit stated that a high-level officer of a state agency had "classified" the financial instruments the defendant dealt in as securities. 680 F.2d at 1092. In fact, the state agency had no procedure for classifying financial instruments as securities, and the officer had only given a qualified opinion. *Id.* We observed that the term "classified" carries weight, connoting an "authoritative result of ordered procedures and methodologies, and not an ad hoc and qualified oral opinion of a single agency employee." *Id.* at 1094. We held that the wide gap between the affidavit's plain meaning and the affiants' intended meaning, the importance of the misrepresentation for "conferring an aura of legitimacy" on what amounted to a novel legal theory, and other circumstantial factors—such as the experience and sophistication of the affiant and a lack of exigent circumstances—all conclusively favored recklessness. *Id.*

Comparison of this case to *Alvarez* and *Namer* demonstrates that Parkinson's statement was not so obviously false to amount to a reckless disregard for the truth. The affiant's understanding of the key term in *Alvarez* was completely implausible. 127 F.3d at 375. And if his understanding were truthfully conveyed, it would have decimated the basis for probable cause. *See id.* Here in contrast, Parkinson's interpretations of "receive" and "given" do not

depart substantially from how they are commonly used. And, if his understanding of the terms were fully conveyed, Parkinson's affidavit still would have supported a finding of probable cause. Moreover, unlike the affiants in *Namer*, Parkinson was not attempting to pass pyrite off as gold. The affiants' misstatement in *Namer* was "a crucially material one" that carried an air of authority, and thus provided their "best, if not only, hope for conferring an aura of legitimacy on their legal theory." 680 F.2d at 1094. Here, unlike the term "classify," the terms "receive" and "given" lack the same authoritative punch. And Parkinson did not need to pin his hopes on an overstatement like the affiants in *Namer*. He could have simply stated the whole truth, and, as Ortega conceded, almost certainly would have acquired the warrant.

Turning to the other circumstances surrounding the affidavit's creation—Parkinson's relative inexperience, his failure to consult lawyers, and the absence of evidence of exigency—we find that they favor Ortega's position, but not overwhelmingly so. *See Alvarez*, 127 F.3d at 375; *Namer*, 680 F.2d at 1094. These factors point in different directions and none stands out as clearly more important than the others. As the district court found, Parkinson "was a fairly new detective" with less than three years of experience as a detective when he sought the search warrant. Parkinson testified that during the time he was investigating Ortega, he was the "new guy" in the Gang Unit. He had been a police officer for at least 13 years when he created the affidavit, but the record does not reveal how long he had been applying for warrants or how many applications he had prepared in the past. Parkinson testified that he needed help from other officers to "get the lingo down." Parkinson does admit that he was in no rush when creating the affidavit. He also admits that he did not consult with any lawyer. While two of these factors circumstantially favor Ortega's position, they are insufficient to show clear error on the part of the

district court given Parkinson's relative inexperience and the fact that Parkinson's understanding of his affidavit was not obviously false.

To undermine Parkinson's credibility, and thus his explanation for his false statements, Ortega argues that Parkinson changed his story between the two suppression hearings. According to Ortega, at the first hearing Parkinson admitted that he did not speak Spanish, Jacinto translated for him, and Parkinson did not ask questions. Parkinson also admitted that the informant was not his source, that his only reason for believing the informant was reliable was that he had been told so by Jacinto, and that he did not know how many times the informant had provided reliable information. Ortega contends that at the second hearing, Parkinson's story changed. There, Parkinson testified that he could understand some of what the informant said and that he was present when the informant had conveyed reliable information on previous occasions.

Ortega faces a steep uphill battle to establish these facts, given the clear error standard of review and the district court's credibility findings. The district court took live testimony and found that Parkinson was a credible witness. It also found, based on its review of the two hearing transcripts, that Parkinson's pre-appeal and post-remand testimony were generally consistent—both indicated that Parkinson and Jacinto "worked as a team" and had contemporaneously received the information.

Our review of the record reveals sufficient continuity in Parkinson's story to conclude that the district court's finding was not clearly erroneous. Parkinson's descriptions of his Spanish language abilities do not warrant a finding of clear error. Parkinson stated in the first hearing that he did not speak Spanish. He appears to have meant that quite literally because his later testimony indicates that he can understand some Spanish. Those two statements are not plainly inconsistent, and Parkinson's explanation for this

mismatch—that he often listens to the language spoken and can make out specific words, but cannot have fluent conversations—seems sensible. And while Parkinson's present explanation could come off as a little too convenient, he and the district court were correct to point out that at the first hearing he was never asked whether he understood some of what the informant said. At this stage and without access to Parkinson's live testimony, we are not in a position to make such a judgment call. Instead, we defer to the district court. With respect to Ortega's other alleged contradiction, there appears to be none. Parkinson's original testimony was that the informant was Jacinto's. This does not conflict with his later testimony that he had been present on other occasions when the informant relayed information to Jacinto and that he learned from Jacinto that the information resulted in arrests.[2]

### III.

For the foregoing reasons, the district court's finding that Parkinson's false statement was not made intentionally or recklessly is free from clear error. Accordingly, we AFFIRM Ortega's conviction and sentence.

---

[2] Ortega also points out conflicts between factual conclusions in our prior opinion and Parkinson's testimony on remand. Ortega notes that in our prior opinion we stated that "Parkinson admitted that he never worked with [the informant] previously; instead, [the informant] had worked with Jacinto, who in turn told Parkinson that [the informant] had provided reliable information in the past." *Ortega*, 854 F.3d at 827. This squarely conflicts with Parkinson's testimony at the suppression hearing that he was present when the informant relayed the information to Jacinto. We also stated that Parkinson "does not understand" Spanish, *id.*, a proposition that clearly conflicts with Parkinson's testimony at the second hearing and the district court's factual findings. Ortega has not argued that we are bound by these findings under the law of the case, and we therefore do not consider any such argument. *See supra* note 1. But even if we were to consider whether the law of the case binds us, we would conclude that it does not. The doctrine is "not an inexorable command" and may be departed from if evidence subsequently adduced is "substantially different" from the evidence previously before the court. *See White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir. 1967). Where, as is the case here, "new evidence is properly introduced on an open issue not governed by the law of the case," we have "discretion to consider its effect on an earlier determination now shown to be probably erroneous." *See* 18B Wright et al., *supra*, § 4478 at 686.